885 A.2d 816

**Wendell HACKLEY**

v.

**STATE of Maryland.**

**No. 18, Sept. Term, 2005.**

Court of Appeals of Maryland.

Nov. 9, 2005.

Allison E. Pierce, Assistant Public Defender (Nancy S. Forster, Public Defender, of Baltimore, on brief), for petitioner.

Gregory D'Alesandro, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, of Baltimore, on brief), for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

WILNER, J.

Petitioner, Wendell Hackley, was convicted in the Circuit Court for Prince George's County of second degree assault, reckless endangerment, and stalking. Upon his conviction for stalking, he was sentenced to five years in prison, all but two of which were suspended in favor of probation. He appealed to the Court of Special Appeals, claiming that the crime of

stalking requires "approaching or pursuing" the victim and that the evidence failed to show that he engaged in that conduct.

The intermediate appellate court agreed that "approaching or pursuing" was an element of the offense but affirmed the conviction on the ground that Hackley's conduct amounted to approaching or pursuing his victim. *Hackley v. State*, 161 Md.App. 1, 866 A.2d 906 (2005). We granted Hackley's petition for *certiorari* to consider the two questions he raised in the Court of Special Appeals. Although we believe that the Court of Special Appeals misconstrued the statute and shall hold that the crime of stalking does not require that the defendant approach or pursue his victim, its erroneous interpretation does not assist Hackley. We shall affirm the judgment of that court, and with it the stalking conviction.

## BACKGROUND

Most of the testimonial evidence in this case came from the victim, Devora P., and petitioner Hackley. Some of it was in dispute. As the State obviously prevailed, we view the evidence, and all inferences fairly deducible from the evidence, in a light most favorable to the State. *State v. Albrecht*, 336 Md. 475, 649 A.2d 336 (1994), quoting *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). We therefore accept the version testified to by Ms. P.

Ms. P. had dated Hackley for an eight month period in 1991, during which she became pregnant. Her daughter, Adriana, was born in October, 1991. From the time they ended the relationship in 1991, Ms. P. had no contact of any kind with Hackley until November 17, 2001, when, about 7:30 in the morning, as she was sitting in her car in the driveway of her home about to go to work, Hackley appeared, walked over to the car and asked "Where is my daughter?" Ms. P., surprised to see him, replied that Adriana was not there, whereupon he reached into his pocket, pulled out a gun, opened the car door, pulled Ms. P. out, and began hitting her in the head with the gun.

Ms. P. called for her mother, who was in the house. When the mother came out, Hackley stopped hitting Ms. P., who, bloodied from the attack, ran into the house. The mother called 911. The tape of the call was admitted into evidence and played for the jury. Ms. P. went to the hospital and received at least eight stitches to close her wounds. An arrest warrant was issued two days later charging Hackley with attempted murder [1] and first degree assault, although Hackley was not apprehended until December 28, 2001.

At some point, after November 17 and before December 16, Ms. P., as she was leaving to go to work, observed what turned out to be two letters from Hackley under the windshield wiper of her car. With respect to the first incident—the assault—Ms. P. testified that her car was parked in her driveway, which photographic exhibits showed is immediately adjacent to her house. Ms. P. called the police. An officer responded, retrieved the letters, and gave them to Ms. P.

One of the letters is addressed to Ms. P., the other to Adriana. In the letter to Ms. P., Hackley acknowledged hitting her. He claimed that it was not really he, however, as, when he is on drugs, "another personality comes out of me, and he came over there to kill you on that day." Among other things, Hackley said in the letter that "[i]f I see you with another man in these next few weeks I'm shooting no questions asked and that's a promise I will not break. I'm trying to warn you before I seriously hurt you, I think you now see what I'm capable of but that's nothing compared to what I have done before, and will do it again if necessary."

In his letter to Adriana, he professed great love for the child, with whom he had had no contact for nearly 10 years, although he warned her "no playing with boys and no boy friend until you are 18 years old, No white boys or I kill with the quickness you can bet that ..." He again acknowledged having assaulted Ms. P. and told the child "[w]hat I think I did

---

1. There was evidence that Hackley attempted to fire the gun at Ms. P., and that he began hitting her with the weapon when it did not fire.

to her is nothing compared to what was going to happen that day. I came there to kill her and that's the truth ..."

The surreptitious leaving of letters for Ms. P. and Adriana on Ms. P.'s car occurred on two subsequent occasions. On the first of those occasions, the letter addressed to Ms. P. began with the statement, "You have ten days left or the killing starts. Don't think police can stop me ..." The letter to Adriana stated, "Your no good mother has only ten days before the killing starts. She thinks this is a game but she will find out very soon how real I am."

On the morning of December 14, 2001, Ms. P. and her children went briefly to a neighbor's house to arrange for the neighbor to pick up the children, presumably from school. As they left the neighbor's house, she saw Hackley coming up the street in the same truck he had used on November 17. She and the children ran into her house, and she called the police. That was the last day she saw her dog. The dog had been outside on a leash. She found the leash cut and the dog gone.

Two days later, Ms. P. again called the police when she noticed a mysterious item on her car. The item turned out to be a bookbag that Ms. P. had never seen before, inside of which were some children's clothes, a basketball, and four letters from Hackley, two addressed to Ms. P. and two to Adriana. The letters were more rambling than the earlier ones, but of the same tenor. They were threatening and asserted the futility of any attempt to stop Hackley from carrying out his mission. In one of the letters to Ms. P., Hackley advised that "I watch you almost every day, remember I have an[] A1 rifle that could hit you from 2 football fields away so don't play."

## DISCUSSION

■ At the time Hackley was charged, the crime of stalking was set forth in Maryland Code, Art. 27, § 124 (1996 Repl. Vol., 2001 Supp.). The offense is now codified, with only style changes, as § 3–802 of the Criminal Law Article. The substantive part of the statute provided that "[a] person may not

engage in stalking" and set forth the penalties for a violation. Subsection (a) defined "stalking" as "a malicious course of conduct *that includes* approaching or pursuing another person with intent to place that person in reasonable fear: (i) Of serious bodily injury or death; or (ii) That a third person likely will suffer serious bodily injury or death." (Emphasis added). That subsection, in addition, defined "course of conduct" as "a persistent pattern of conduct, composed of a series of acts over a period of time, that evidences a continuity of purpose."

Hackley's defense is a stepped one. He contends, first, that, despite the fact that the statute defines "stalking" as a "malicious course of conduct that *includes* approaching or pursuing another person," approaching or pursuing another person is an essential element of the offense, and, unless the evidence showed that he approached or pursued Ms. P. in a series of acts over a period of time, his conviction for stalking cannot stand. Approaching or pursuing, he next insists, requires that the victim be aware of the fact that he or she is being approached or pursued, that the conduct must be committed in her presence. The evidence here, he avers, did not suffice to make that showing—that, at worst, it showed that he approached Ms. P. on only one occasion—when he pistol-whipped her on November 17, 2001. Leaving letters and a bookbag on her car, when she was not there to see him do it, does not, in his view, constitute approaching or pursuing her. We are not impressed. His argument has no merit.

The issue presented is one of statutory construction, and the rules for that are well defined. Our predominant goal is to ascertain and effectuate the legislative intent. We look first to the words of the statute, assigning them their ordinary meaning, but reading them in the context of the statutory scheme. *See Cain v. State,* 386 Md. 320, 327–28, 872 A.2d 681, 685 (2005).

Section 124 did not define stalking as the approaching or pursuing of another person. It did not say that stalking "means" the approaching or pursuing of another with the

stated intent. Rather, it defined the crime as a malicious course of conduct that *includes* approaching or pursuing another person with the requisite intent. Article 1, § 30 of the Code deals directly and specifically with the meaning of "includes," when used in a statute. It states that "[t]he words 'includes' or 'including' mean, unless the context *requires* otherwise, includes or including by way of illustration and not by way of limitation." (Emphasis added). Citing that statute, the Maryland Style Manual for Statutory Law prepared by the Department of Legislative Services, an arm of the General Assembly, as "the style manual for drafting statutory law in Maryland," to "be followed in preparing any legislation for the General Assembly," directs legislative drafters to "[u]se 'means' if the definition is intended to be exhaustive" (" 'Department' means the Department of Agriculture") and to "[u]se 'includes' if the definition is intended to be partial or illustrative" (" 'Disinfect' includes to sterilize"). *See* MARYLAND STYLE MANUAL FOR STATUTORY LAW, Department of Legislative Services (Jan.1998) at 27.

Application of those legislatively created interpretative mandates leads to the clear conclusion that "includes," as used in § 124, was intended to be illustrative of the kinds of malicious conduct that could constitute stalking, and not to limit the crime to approaching or pursuing another person. The essential element is the malicious course of conduct, which, along with other things, includes approaching or pursuing another person, coupled with the stated intent. Relying almost entirely on legislative history, Hackley asserts the contrary. He claims that, in light of a separate harassment statute and the fact that stalking statutes in other States include approaching or pursuing as elements, the Legislature, notwithstanding the language it used, must have intended for approaching or pursuing to be required elements of the Maryland offense.

There is no need, of course, even to consider legislative history if the words of the statute are unambiguous, as we believe they are. The fact is, however, that the legislative history supports our view of the plain meaning of the language, rather than Hackley's stretched interpretation, and, as

that history is the essence of his argument, we shall comment on it.

The prohibition against stalking was first enacted in 1993. The Legislature had previously, in 1986, enacted a law against harassment which, when the stalking law was enacted, appeared in § 121A of Art. 27. The harassment law, after defining "course of conduct" precisely as it was later defined in the stalking law, made it a misdemeanor subject to a 90 day jail term and a $500 fine for a person

"[t]o follow another person in or about a public place or maliciously engage in a course of conduct that alarms or seriously annoys another person:

(1) with intent to harass, alarm, or annoy the other person;

(2) After reasonable warning or request to desist by or on behalf of the other person; and

(3) Without a legal purpose."

The stalking law emanated from two bills introduced into the 1993 session of the General Assembly—Senate Bill 7 and House Bill 433. The initial versions of the two bills were quite different, although, through the legislative process, they were conformed and were enacted in identical fashion. The initial version of Senate Bill 7 was not a stalking law, but rather an enhanced harassment law. It would have limited the existing harassment law to conduct that merely annoyed or was intended to annoy another person. The new crime of harassment would have been defined as

"engag[ing] in a knowing and willful course of conduct that is directed at a specific person, including repeated following of a person, that

(i) Causes the person to fear for the person's own safety or the safety of a family member;

(ii) Would cause a reasonable person to fear for the person's own safety or the safety of a family member; and

(iii) serves no legitimate purpose."

Engagement in that activity with intent to cause the other person to fear for the person's safety or that of a family member would have been a misdemeanor subject to one year in jail and a $1,000 fine. If the defendant, in carrying out that conduct, made a "credible threat" against the person being harassed, the penalty was increased to two years and a $2,000 fine.

The Senate Judicial Proceeding Committee completely rewrote the bill and turned it into a stalking offense. With the committee amendments, which were adopted by the Senate, the bill made it a crime to "stalk another person with the intent to place that person in fear of bodily injury or death." The word "stalk" was defined as "to harass or repeatedly follow another person in such manner as (i) to cause that person to suffer substantial emotional distress; and (ii) would cause a reasonable person to suffer substantial emotional distress." Three terms used in that provision—harass, repeatedly, and follow—were also defined. "Harass" was defined as "a course of conduct directed at a specific person which would cause a reasonable person to fear bodily injury or death, including oral threats, written threats, vandalism, or nonconsensual physical contact." "Repeatedly" was defined as "two or more separate occasions," and "follow" was defined to mean "to maintain a visual or physical proximity over a period of time to a specific person in such a manner as would cause a reasonable person to fear bodily injury or death."

House Bill 433 took a somewhat different approach. The initial version prohibited stalking and defined "stalk" as "to engage in a knowing and willful course of conduct that involves an express or implied threat to kill another person or to inflict bodily injury on another person that is made: (i) with the intent to place that person in fear of bodily injury or death; and (ii) in any manner or context that causes that person to reasonably fear bodily injury or death." That conduct would have constituted a felony subject to a three year prison sentence and a fine of $5,000, but, for a subsequent offense or if the person was subject to a domestic violence protective order when the conduct was committed,

the penalty would have been five years in prison and a $10,000 fine. In neither version was approaching, following, or pursuing a required element.

As occurred in the Senate with respect to Senate Bill 7, the House Judiciary Committee completely rewrote House Bill 433, to put it essentially in the form in which it was enacted. When Senate Bill 7 reached the House of Delegates, the House Judiciary Committee amended it to read precisely as House Bill 433 read with the House Judiciary Committee amendments. When House Bill 433 reached the Senate, the Senate Judicial Proceedings Committee amended it to read as Senate Bill 7 read when it passed the Senate. The two Houses were thus in disagreement, each insisting on its version of what the law should say. Both bills were referred to a Conference Committee, which opted for the House version of the bill, and, as noted, both bills were enacted in that manner. The necessary amendments were added to House Bill 433 to restore it to the form in which it passed the House, and both bills, appropriately enrolled, were signed by the Governor as 1993 Md. Laws, chs. 6 and 7.

The committee files with respect to both bills reveal two critical facts: first, that the Legislature was concerned that the existing harassment and assault laws were not adequate to deal with the kind of conduct sought to be made criminal in the stalking law, and second, that it was well aware that many States had already adopted laws dealing with stalking and that the language used in those laws tended to differ from State to State. The Senate Judicial Proceedings Committee Floor Report on House Bill 433, as amended by that committee, notes, for example, that "a man who makes threatening telephone calls to his ex-wife several times a week would probably display the type of stalking behavior covered by the bill [,but] he would not be guilty of assault unless he showed the present intent and means to injure his ex-wife on the spot." The Floor Report also points out that "it is not always possible or feasible in [a] stalking situation for the victim to provide a reasonable warning or request to 'desist," which was a requirement of the harassment law. An intent to include a

series of threatening telephone calls as a form of stalking is clearly inconsistent with an intent to require a physical approaching or pursuing of the victim. Copies of and references to the laws in other States appear in the legislative files, and the Legislature was thus aware that some of those laws defined stalking in terms of following or pursuing the victim.

The General Assembly had before it not only that kind of information but at least four different versions of a stalking law—the original approach taken in Senate Bill 7, the original approach taken in House Bill 433, the Senate Judicial Proceedings Committee rewriting of both bills, and the House Judiciary Committee rewriting of both bills. It ended up adopting the House Judiciary Committee version, which *included* approaching or pursuing the victim but did not limit the crime to that conduct. In light of the extensive legislative consideration given to the matter, we must assume that the ultimate articulation of the crime was deliberate and intended—that the language used denotes precisely what the Legislature intended. We thus hold that any malicious course of conduct intended to place another person in reasonable fear of serious bodily injury or death or that a third person likely will suffer such harm constitutes stalking.

Notwithstanding Hackley's protestations, there can be little doubt, and certainly no reasonable doubt, that his conduct satisfied that standard. There were four occasions, occurring within the period of a month—the initial vicious assault, leaving threatening letters on the victim's car, approaching the victim early in the morning in the same truck he drove on the first occasion coupled with the mysterious disappearance of the victim's dog, and leaving the bookbag containing four more threatening letters on the victim's car.

**JUDGMENT OF COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.**