903 A.2d 908

**Donald Marcell RIVERS, Sr.**

v.

**STATE of Maryland.**

**No. 105, Sept. Term, 2005.**

Court of Appeals of Maryland.

July 31, 2006.

570

George E. Burns, Jr., Assistant Public Defender (Nancy S. Forster, Public Defender, on brief), Baltimore, MD, for Petitioner.

Diane E. Keller, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, on brief), Baltimore, MD, for Respondent.

Argued before BELL, C.J., and RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

HARRELL, J.

On 22 June 2004, Donald Marcell Rivers, Sr., Petitioner, was convicted by a jury in the Circuit Court for Washington County of one count of possession of a noncontrolled substance

with the intent to distribute as a controlled dangerous substance ("CDS") and one count of distribution of a noncontrolled substance that he had represented as a CDS, in violation of Maryland Code (2002), Criminal Law Article, § 5–617(a).[1] Petitioner timely appealed to the Court of Special Appeals, which affirmed Petitioner's convictions in an unreported opinion. Petitioner filed with this Court a Petition for Writ of Certiorari, which we granted, *Rivers v. State*, 390 Md. 284, 888 A.2d 341 (2005), to consider the question, rephrased for clarity:

> Whether the evidence was sufficient to establish that the substance Petitioner distributed was a noncontrolled substance where (1) witnesses testified that Petitioner sold the substance as crack cocaine; (2) a forensic chemist accepted by the trial court as an expert witness testified without objection that, judging from the form of the substance, it could not be any controlled substance other than cocaine; and (3) a single chemical test established that the substance was not cocaine.[2]

We affirm the judgment of the Court of Special Appeals and hold that there was sufficient evidence to establish that the substance was not a controlled dangerous substance.

## I.

The basic facts of this case are undisputed. The Court of Special Appeals aptly described them:

> Late on the night of December 5, 2003, in a parking lot in downtown Hagerstown, Maryland, [Rivers] and Vincent Watson were sitting in a parked Honda when a second car,

---

1. Maryland Code (2002), Criminal Law Article, § 5–617(a) prohibits the distribution, attempt to distribute, or possession with intent to distribute a noncontrolled substance as a controlled dangerous substance. Unless otherwise provided, all statutory references are to Maryland Code (2002), Criminal Law Article.

2. We note that Petitioner does not appeal from his conviction for possession with intent to distribute a noncontrolled substance as a controlled dangerous substance.

driven by Joseph Tomlin, pulled into the lot. While Tomlin remained seated in his vehicle, Rivers and Watson exited theirs and approached him. Each sold Tomlin a product that Tomlin believed was crack cocaine. The bag sold by Rivers contained one "rock," and the one sold by Watson contained two. In exchange for the rocks, [Rivers] asked Tomlin for $30 and Watson asked for $40. Because Tomlin had only twenty-dollar bills, Tomlin paid [Rivers] and Watson $40 each. Tomlin told [Rivers] that he could consider the extra $10 "a loan."

Unbeknownst to Watson, Tomlin was a paid informant employed by the Hagerstown Police Department. On that night, the police had sent him out to purchase drugs, using twenty-dollar bills that had been previously photocopied for the purpose of verifying the receipt by drug sellers of proceeds from their sale of drugs to Tomlin.

After making the purchase of what Tomlin thought was crack cocaine from Rivers and Watson, Tomlin signaled nearby police officers that he had just bought drugs from the two men. The officers arrived at the parking lot, while [Rivers] and Watson were still in Tomlin's sight.

[Rivers] was standing on the passenger's side of a vehicle and Watson was standing on the opposite side when the police officers arrived. The police arrested both men and recovered four of the twenty-dollar bills, whose serial numbers had been prerecorded. Two of the twenty-dollar bills were on the ground near [Rivers'] feet, and the other bills were found on the driver's side of the vehicle that the arrestees had just occupied. Upon searching the car, the police recovered what appeared to be a drug pipe, as well as a third plastic bag that contained what appeared to be five rocks of crack cocaine.

After the arrests, Officer David Russell and another officer field tested the substance found in the bag sold by Rivers and in the bag found on the driver side of the car. All tested negative for the presence of cocaine. These same negative results were reproduced through later testing con-

ducted by Susan Blankenship, a forensic scientist employed by the Hagerstown Police Department.

During trial, the State introduced the above evidence through the testimony of Officer David Russell, Joseph Tomlin, and Ms. Blankenship. Rivers introduced no evidence.

Officer Russell testified that he sent Tomlin to an area known for illegal drug transactions, that Tomlin told him that he purchased the substance from Rivers, and that the appearance of the substance Tomlin purchased was consistent with a $40.00 piece of crack cocaine:

Q. Alright, now, when the informant was equipped with the microphone and the money, and had been searched, where did he go?

A. We released him from the parking lot of the police department, and, uh, he went into the downtown area. I believe his parameters that night, that I had set them where I want him to go, was Washington Street, Cannon Avenue, Franklin Street, and, Potomac Street.

Q. So, a rectangular area of about . . .

A. Yes.

Q . . . . four city blocks?

A. That's correct.

Q. Is this an area where, in your experience, you've conducted successful investigations previously?

A. Yes.

Q. And, those have been drug investigations?

A. Yes.

\* \* \*

Q. Very good. So, after you saw the informant, uh, post transaction, across Franklin Street, what did you do?

A. Uh, he came across the street to me, and, uh, in one hand he had two pieces, two small, like rock, like objects wrapped in, wrapped in plastic, um, that was consistent with the appearance of crack cocaine. Um, he handed me those two, and he pointed to Mr. Watson and stated he had

bought those two items from Mr. Watson for $40. In the other hand, separate he had one piece, wrapped in plastic, the same, same substance. He pointed to Mr. Rivers and advised that he had purchased that from Mr. Rivers for $40.

\* \* \*

Q. And, are you familiar with the size and shape of a $40 piece of crack cocaine from your experience since August?

A. Yes.

Q. And, is that consistent with what you know to be ...

[DEFENSE COUNSEL]: Objection.

Q. . . . a $40 piece of cocaine?

THE COURT: Overruled. You have a right to cross-examine. Overruled.

A. Yes, it is.

Tomlin testified that he acted as an police informant for more than a decade and, in that capacity, purchased crack cocaine several hundred times. He further stated that he purchased the rocklike substance from Rivers because it appeared to him to be crack cocaine:

Q. And, did there come a time on December 5, 2003, where you acted as a confidential narcotics informant for the Street Crimes Unit?

A. Yes, sir, that's correct.

Q. And, have you operated in this capacity previously?

A. Yes, sir.

Q. About how frequently?

A. I do, possibly a month, possibly, maybe, 10.

Q. Ten (10) a month?

A. Yes, sir.

Q. For how long a period?

A. Been doing it for 12 years.

\* \* \*

Q. Okay. And, what'd [Rivers] do?

A .... he told me he could really hook me up with a $30 piece, and, uh, I told him I'd like, like to see it. He said, "Wind your window just halfway down." I said, "Well, I'm scared I might get robbed or something." So, then, I took my window all the way down then and, um, I told him all I had was $40, then he gave me the piece he had, and I told him he would just owe me $10.

On recross, the following exchange occurred between defense counsel and Tomlin:

Q. ... You purchased crack cocaine on the streets many, many times, it that right?

A. Yes, sir.

Q. How many times would you say you have?

A. In my life?

Q. Yes.

THE COURT: If you know.

A. I, I'd give an estimate, maybe, 450, with crack cocaine.

\* \* \*

Q. And, and, you're really not concerned what [the substance] is, you were gonna buy it that night, is that right . . .

A. No, sir.

Q. ... under those circumstances?

A. No, sir. No, sir. It appeared to be crack cocaine to me. That's why I bought it, as of.

Q. When you say it "appeared to be crack cocaine," how well did you analyze this before you purchased it?

A. When you're on the streets, when you're buying drugs, you don't sit and open the stuff up, and pinch it off, you want to get out. The person sells you, the want to go their way. It's like a rush-rush.

Ms. Blankenship testified that, as part of her scientific analysis, she visually inspected the rocklike substance before

conducting chemical tests, which later determined that the substance was not cocaine:

Q. According to the standards that you, uh, abide by as a forensic chemist, is a physical examination part of those standards?

A. Yes, it is.

Q. Is it the first step in those standards?

A. Yes, it is.

Q. And, have you had occasion to obey those standards in examination of a wide variety of controlled dangerous substances.

A. Yes, I have.

Q. And, have you seen a wide variety of controlled dangerous substances?

A. I have seen, um, multiple substances from every single one of the schedules, one through five.

Q. And, so, it's, is it ... do you know what those items look like initially on examination?

A. Um, they come in multiple different forms, most of them, but, uh, the main forms we get in are either tablets, capsules, powders, plantlike substance, or rocklike substance.

Q. And, of the rocklike substances, what's ... withdraw the question. Which category does this substance fit into?

A. This is a rocklike substance.

Q. Alright. So, it's not a capsule?

A. No, it's not.

Q. It's not a plant substance?

A. No, it's not.

Q. It's not a powder?

A. No, it's not.

Ms. Blankenship further testified that the rocklike substance, in her expert opinion, could not be any other form of controlled dangerous substance:

Q. And, does this rocklike appearance limit the number of controlled dangerous substances that this could possibly be?

A. Yes, it does.

Q. And, is that part of your scientific analysis, just, basically, eyeballing of the substance?

A. Yes, it is.

Q. Alright. Now, based on your experience and your training in the scientific method of examining it, could this be any other substance beside what you did the (inaudible) chemical tests for?

[DEFENSE COUNSEL]: Objection, Your Honor.

THE COURT: Overruled. You'll have a right in a cross, which I'm sure you'll do.

Q. Mean, meaning a controlled dangerous substances. Not, it's, obviously, is another substance, my question is this, could it be any other controlled dangerous substance?

A. No, the only controlled dangerous substance that comes into our laboratory as controlled, that appears to be a rocklike substance, is cocaine base.

Q. Alright. And, this isn't cocaine base?

THE COURT: Food for cross-examination.

A. No, it is not.

The jury found Rivers guilty of both possession of a noncontrolled substance with the intent to distribute as a CDS and distribution of a noncontrolled substance that he represented as a CDS, in violation of § 5–617(a). The trial court merged the two convictions for sentencing purposes and sentenced Rivers to four and one-half years in prison.

On appeal to the Court of Special Appeals, Rivers contended that his convictions should be reversed because, among other reasons he advanced, the trial court denied erroneously his motion for a judgment of acquittal due to the lack of evidence showing that the substance sold was noncontrolled. He asserted that a chemist could not have determined reliably that a substance was a noncontrolled substance solely by conducting a combination of visual inspection and a single chemical

procedure testing for the presence of cocaine. The Court of Special Appeals rejected Rivers' contention, holding that:

> As to [the question whether the State presented sufficient proof that the substance sold was a noncontrolled dangerous substance], the State did present such proof through Ms. Blankenship's unobjected-to opinion testimony.[ ] (Footnote omitted.)

The Court of Special Appeals noted Ms. Blankenship's qualifications and expertise in forensic science:

> Susan Blankenship was accepted by the court as an expert in the chemical analysis of controlled dangerous substances ("CDS"). Ms. Blankenship holds a Master's degree in forensic science from George Washington University. Since 1991 she has been regularly employed as a forensic scientist-four years with the federal Drug Enforcement Agency and approximately nine years with the Hagerstown Police Department. Her primary duties in these jobs have been to identify CDS's.

Noting that the trial court accepted Ms. Blankenship as an expert in the chemical analysis of controlled dangerous substance, the Court of Special Appeals also rejected Petitioner's contention that "a well-trained expert like Ms. Blankenship cannot exclude a substance as a particular type of controlled dangerous substance by sight."

> For example, it is obvious from the evidence that a forensic scientist like Ms. Blankenship who works with controlled dangerous substance every day could look at a plant-like substance (e.g., a leaf of lettuce) and tell that it is not marijuana. In fact, Ms. Blankenship's unrebutted testimony was that the first action a forensic scientist takes before conducting tests is to observe the "physical form of the substance." She further testified, uncontradictedly, that the only type of CDS that comes in "rock-like form" is cocaine. This being so, no chemical tests were needed to eliminate the many other drugs that appear on the five schedules listing all other types of CDS.[] (Footnote omitted.)

II.

■ The appellate standard for reviewing challenges to the sufficiency of the evidence is well established. In *State v. Albrecht*, 336 Md. 475, 478, 649 A.2d 336, 337 (1994), we stated that "it is not the function or duty of the appellate court to undertake a review of the record that would amount to, in essence, a retrial of the case." When reviewing a challenge to the sufficiency of the evidence, the reviewing court "view[s] the evidence, and all inferences fairly deducible from the evidence, in a light most favorable to the State." *Hackley v. State*, 389 Md. 387, 389, 885 A.2d 816, 817 (2005) (Citations omitted). We determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Smith*, 374 Md. 527, 533, 823 A.2d 664, 668 (2003) (Citations omitted).

Petitioner seeks review of his conviction for distributing faked controlled dangerous substance under § 5–617, which provides, in pertinent part:

(a) *Prohibited.*—A person may not distribute, attempt to distribute, or possess with intent to distribute a noncontrolled substance:

(1) that the person represents as a controlled dangerous substance;

(2) that the person intends for use or distribution as a controlled dangerous substance; or

(3) under circumstances where one reasonably should know that the noncontrolled substance will be used or distributed for use as a controlled dangerous substance.

(b) *Considerations.*—To determine if a person has violated this section, the court or other authority shall include in its consideration:

(1) whether the noncontrolled substance was packaged in a manner normally used to distribute a controlled dangerous substance illegally;

(2) whether the distribution or attempted distribution included an exchange of or demand for money or other

property as consideration, and whether the amount of consideration was substantially greater than the reasonable value of the noncontrolled substance; and

(3) whether the physical appearance of the noncontrolled substance is substantially identical to that of a controlled dangerous substance.

(c) *Penalty.*—A person who violates this section is guilty of a felony and on conviction is subject to imprisonment not exceeding 5 years or a fine not exceeding $15,000 or both.

To support a conviction under § 5–617(a), the State must prove that the substance in question is a "noncontrolled substance." " 'Noncontrolled substance' means a substance that is not classified as a controlled dangerous substance under ... this title." Maryland Code (2002), Criminal Law Article, § 5–101(s).[3] Sections 5–401 through 406 of the Criminal Law Article collectively define the list of substances that are classified as controlled dangerous substances under this statute. Maryland Code (2002), Criminal Law Article, §§ 5–401 to –406.

▮▮▮ To prove whether a substance is controlled or noncontrolled, the State may offer circumstantial evidence as well as direct evidence.[4] *See Robinson v. State,* 348 Md. 104, 113–14, 702 A.2d 741, 745 (1997) (citing *Weller v. State,* 150 Md. 278, 282, 132 A. 624, 625–26 (1926)) (holding that "the nature of a suspected controlled, dangerous substance, like any other

---

3. The trial court in this case succinctly summarized this provision: "[The substance], either it is, or it isn't [a CDS,]" echoing the millennia-old utterance by the Greek philosopher Parmenides: "What is, is; what is not, is not." GILBERT MURRAY, A HISTORY OF ANCIENT GREEK LITERATURE 156 (Edmund Gosse ed., 1900) (1897).

4. Direct evidence is "[e]vidence, which if believed, proves existence of [a] fact in issue without inference or presumption." *State v. Smith,* 374 Md. 527, 547 n. 8, 823 A.2d 664, 675 n. 8 (2003) (citing BLACK'S LAW DICTIONARY 461 (6th ed.1990)). In contrast, circumstantial evidence is "[e]vidence of facts or circumstances from which the existence or nonexistence of [a] fact in issue may be inferred. Inferences drawn from facts proved." *Smith,* 374 Md. at 547 n. 8, 823 A.2d at 675 n. 8 (citing BLACK'S LAW DICTIONARY 243).

fact in a criminal case, may be proven by circumstantial evidence") (Footnote omitted). We also have emphasized repeatedly that

> [a] valid conviction may be based solely on circumstantial evidence. *Wilson v. State,* 319 Md. 530, 537, 573 A.2d 831, 834 (1990). The same standard applies to all criminal cases, including those resting upon circumstantial evidence, since, generally, proof of guilt based in whole or in part on circumstantial evidence is no different from proof of guilt based on direct eyewitness accounts. *See Eiland v. State,* 92 Md.App. 56, 607 A.2d 42 (1992), *rev'd on other grounds,* 330 Md. 261, 623 A.2d 648 (1993).

*Smith,* 374 Md. at 534, 823 A.2d at 668.

■ If the exact chemical composition of the substance is unknown, the State may employ a process of elimination to establish that the substance is not a controlled dangerous substance. *See In re Timothy F.,* 343 Md. 371, 374–75, 681 A.2d 501, 503 (1996) (finding that the substance was a noncontrolled substance where "[l]aboratory analysis ... confirmed that the substance was not crack cocaine or any other CDS ...," the child defendant admitted that the substance was "milk chips," and another individual in possession of the substance said it was "soap chips."). The Court of Special Appeals has accepted consistently the process of elimination, if properly conducted, as a reliable scientific methodology in other contexts. *See, e.g., CSX v. Miller,* 159 Md.App. 123, 204–08, 858 A.2d 1025, 1072–74 (2004) (citing *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 262–63 (4th Cir.1999)) (upholding the admissibility of a physician's " 'differential diagnosis,' ... a scientific method that laymen would refer to as the process of elimination," in diagnosing a patient in a tort action by the patient against his employer), *cert. granted,* 384 Md. 581, 865 A.2d 589 (2005), *cert. dismissed as improvidently granted,* 387 Md. 351, 875 A.2d 702 (2005); *Hricko v. State,* 134 Md.App. 218, 269–70, 759 A.2d 1107, 1133–34 (2000) (accepting as sufficient evidence an expert opinion formed through a process of elimination in his analysis of the victim's cause of death). On the other hand, "a finding of guilt based

upon a process of elimination must effectively eliminate the other reasonable possibilities." *Davis v. State,* 100 Md.App. 369, 391, 641 A.2d 941, 952 (1994) (citing *Eiland v. State,* 92 Md.App. 56, 69, 607 A.2d 42, 49 (1992), *rev'd on other grounds,* 330 Md. 261, 623 A.2d 648 (1993)).

### III.

Petitioner argues that the State failed to introduce sufficient evidence to prove that the substance he possessed and distributed was noncontrolled. Petitioner bases his argument on the proposition that, in order to prove that the substance was noncontrolled, the State must satisfy a "two-pronged" test: the State must first introduce sufficient circumstantial evidence to prove that the substance "was cocaine," then prove by chemical analysis that it was in fact not cocaine. Proceeding from this proposition, Petitioner contends that the circumstantial evidence the State introduced through the testimonies of Tomlin, Officer Russell and Ms. Blankenship was insufficient to prove that the substance was cocaine,[5] the first prong of the test he proposes. Without first establishing with circumstantial evidence that the substance "was cocaine," Petitioner argues, the State only proved with the single chemical test that the substance was not in fact cocaine, but failed to eliminate the possibility of the substance being one of the many other controlled substances outlined in §§ 5–401 to –406, the distribution of which falls outside the proscription of § 5–617 and does not support his conviction under that section. In support of his contentions, Petitioner cites a number of cases that examined the sufficiency of circumstantial evidence for a conviction of distribution of controlled or noncontrolled substances, including *State v. Anderson,* 58 Wash.App. 135, 791

---

**5.** In his appeal to the Court of Special Appeals, Petitioner acknowledged that "the State 'proved' that the substance in this case was a controlled dangerous substance" with sufficient circumstantial evidence. Petitioner does not explain in his present appeal why the same evidence, which he conceded as sufficient to prove that the substance was a controlled dangerous substance, is insufficient to prove that the substance was cocaine.

P.2d 557 (1990) (concluding that evidence was sufficient to establish that the substance was noncontrolled where "the criminalist testified that the substance was not heroin or cocaine and that he had eliminated 80 to 90 percent of all controlled substances"), *Jackson v. State,* 86 Ark.App. 145, 165 S.W.3d 467 (2004) (concluding that evidence was insufficient to prove that the defendant delivered or attempted to deliver the counterfeit substance, an element of the offense as defined by the Arkansas statute), *State v. Starr,* 204 Mont. 210, 664 P.2d 893 (1983) (concluding that evidence showing that the substance could be either cocaine or lidocaine did not support a conviction for the sale of a dangerous substance, because lidocaine is not a dangerous substance under Montana law), *State v. Simpson,* 318 Md. 194, 567 A.2d 132 (1989) (concluding that evidence indicating that the defendant possessed either cocaine or heroine, though inconclusive as to which, was insufficient to support either or both of two separately charged offenses, one for the possession of cocaine and the other for the possession of heroin), and *Copeland v. State,* 430 N.E.2d 393 (Ind.App.1982) (opining that expert testimony by a drug user was insufficient to establish that the substance defendant sold him was Dilaudid, a controlled substance under Indiana law, because he did not explain how he identified the substance as such).

The State argues that it is not required first to prove with circumstantial evidence and beyond a reasonable doubt that the substance "was cocaine," followed by a chemical test showing that the substance was not cocaine, in order to establish the nature of the substance as noncontrolled. Rather, the State asserts that it proffered sufficient evidence to prove: (1) that the substance was a noncontrolled substance as defined in § 5–101(s), and (2) that the substance was distributed as a controlled dangerous substance in violation of § 5–617(a). The State contends that Ms. Blankenship's uncontradicted and unobjected-to expert testimony regarding how she determined that the substance was not a controlled dangerous substance was sufficient evidence to prove that the substance was noncontrolled. Moreover, the State maintains that it introduced sufficient evidence through the testimonies of Tom-

lin and Officer Russell detailing the circumstances surrounding the sale of the substance, as well as Ms. Blankenship's expert opinion based on her observation of the packaging and physical characteristics of the substance, to prove that Petitioner sold the substance as crack cocaine in violation of § 5–617(a).[6]

We reject Petitioner's paradoxical proposition that the State must prove first with circumstantial evidence, and then disprove with chemical analysis, that the substance was cocaine, in order to establish that the substance in fact was not a controlled dangerous substance.[7] Such a "two-pronged test" as advanced by Petitioner is neither necessary nor sufficient to establish the substance as a noncontrolled substance. First, Petitioner's two-pronged test is unnecessary because laboratory test results alone may establish that the substance was noncontrolled even though the precise chemical composition of the substance remains unidentified. In *In re Timothy F.*, the defendant was found to be in possession of "a medicine pill bottle containing two pieces and three crumbs of a white substance that looked like crack cocaine." *In re Timothy F.*,

6. Petitioner does not argue that the State failed to prove that he distributed the substance as a controlled dangerous substance. Nonetheless, we recognize that Petitioner's contention that the State must prove first that the substance "was cocaine," then disprove the same supposition, would appear less paradoxical if it meant that the State must prove first that the substance was *sold as* cocaine. Even so, Petitioner's argument concerning the sufficiency of eyewitness and expert testimony as circumstantial evidence is of little relevance to this element of the offense because such evidence, while *circumstantial* for the purpose of proving that the substance *was* cocaine, is in fact *direct* evidence for the purpose of proving that the substance was *sold as* cocaine. *See supra* note 4. The testimony included direct evidence of all three considerations set out in § 5–617(b) for determining whether a substance is distributed as a controlled dangerous substance.

7. As a preliminary observation, we note that a necessary premise of Petitioner's proposition is that the exact chemical composition of this substance is unknown. Otherwise this element of the offense is easily established. *See, e.g., Gipe v. State*, 55 Md.App. 604, 606, 466 A.2d 40, 42 (1983) ("It was later determined that on the tray were ... three other bags containing 50–to–100 caffeine tablets."). We treat Petitioner's argument as if this premise were stated.

343 Md. at 374, 681 A.2d at 503. The defendant said the substance was "milk chips." *Id.* Another individual found to be in possession of the same substance said it was "soap chips." *In re Timothy F.,* 343 Md. at 375, 681 A.2d at 503. Even though it was unclear whether the exact identity of the substance was ever determined through chemical analysis, this Court noted that laboratory test results sufficiently established the noncontrolled nature of the substance because "[l]aboratory analysis ... confirmed that the substance was not crack cocaine or any other CDS. ..." *In re Timothy F.,* 343 Md. at 374, 681 A.2d at 503.[8] In addition, at least two courts in the cases cited by Petitioner held similarly that laboratory analysis alone may establish that the substance was not a controlled dangerous substance. *See, e.g., Jackson,* 165 S.W.3d at 469 ("A drug chemist from the crime lab testified that ... the other substance weighted 1.365 grams, but no controlled substances were detected in it."); *Anderson,* 791 P.2d at 558 (accepting as sufficient evidence a criminalist's testimony that the substance was not heroin or cocaine and that he had eliminated 80 to 90 percent of all possible controlled substances). Moreover, contrary to Petitioner's contention, the "two-pronged test" he proposes does not establish that the substance was a noncontrolled substance. Merely proving that a substance is not cocaine fails to prove that it is not some other controlled substance. First proving by use of circumstantial evidence that the substance "is cocaine," a false conclusion, does not support a final determination that the substance is a noncontrolled substance as required by § 5-617.

Petitioner fails to distinguish between two alternative methods of proof that a substance is noncontrolled: the process of identification, which establishes what the substance is, and the process of elimination, which determines what the substance is

---

8. In *In re Timothy F.,* we did not examine the procedure adopted by the laboratory in arriving at its conclusion that the substance did not contain any CDS, nor did we rule on the issue of the extent and nature of laboratory analysis required to prove that a substance is a noncontrolled one.

not. Petitioner apparently refers to the process of identification when he argues that the State must prove first that the substance "was cocaine" and that it failed to do so, and attempts to draw support for his contention from *Simpson*, *Copeland*, and *Starr*, three cases concerning the sufficiency of evidence for the purpose of identifying the suspected CDS as a particular CDS. What Petitioner fails to recognize is that, absent a positive identification of the exact chemical composition of the substance, the process of determining the nature of the substance, controlled or noncontrolled, is in essence a process of elimination. In *Simpson*, we held that the State must prove the exact identity of the substance in question, given that it brought two separate charges against the defendant, one for each of the two possible identities of the substance, and that it failed to proffer sufficient evidence to identify the substance as either. *Simpson*, 318 Md. at 197–98, 567 A.2d at 133–34. The Court of Appeals of Indiana in *Copeland* similarly held that an expert's testimony was insufficient evidence for the purpose of identifying the substance as Dilaudid, a controlled substance under Indiana law, because "[the expert]'s testimony did not illuminate how he identified the drug . . . ." *Copeland*, 430 N.E.2d at 396. In *Starr*, the Supreme Court of Montana ruled that, because the field test the State relied on could not identify cocaine with reasonable certainty, there was insufficient evidence to sustain a conviction for sale of a controlled dangerous substance where the substance in question could have been lidocaine, a noncontrolled substance under Montana law. *Starr*, 664 P.2d at 896. In all three cases, the State was required to identify the substance as a specific CDS and the evidence proffered was held to be insufficient for that purpose. In contrast, the statute in the present case does not require the State to identify the exact composition of the substance to prove that the substance was noncontrolled. *See In re Timothy F.*, 343 Md. at 374, 681 A.2d at 503. The analysis of evidentiary sufficiency in *Simpson*, *Copeland*, and *Starr* is therefore not applicable to the present case.[9]

---

9. We note too that the two other cases relied on by Petitioner, *Jackson v. State*, 86 Ark.App. 145, 165 S.W.3d 467 (2004) and *State v. Anderson*,

## IV.

■ We conclude that the State proffered sufficient evidence through the testimonies of Tomlin, Officer Russell and Ms. Blankenship to establish, through a process of elimination, that the substance Petitioner sold to Mr. Tomlin was a noncontrolled substance.

■ To support a conviction under § 5–617 based on a process of elimination, the State must introduce sufficient evidence to eliminate effectively all possible CDS's. *See Davis v. State,* 100 Md.App. 369, 395, 641 A.2d 941, 954 (1994) (holding that the evidence was insufficient to convict the defendant for using her residence to distribute prohibited drugs on a recurring basis, a common nuisance, where the

---

58 Wash.App. 135, 791 P.2d 557 (1990), are distinguishable from the present case. In *Jackson,* the issue was not whether the State proved that the substance was a noncontrolled substance—indeed, the *Jackson* court did find that the State proved this element with laboratory analysis, *Jackson,* 165 S.W.3d at 469 ("A drug chemist from the crime lab testified that . . . the other substance weighted 1.365 grams, but no controlled substances were detected in it.")—but rather, whether the State proved that the defendant delivered or attempted to deliver the substance in question or any other of the seven factors required by the Arkansas statute. *Jackson,* 165 S.W.3d at 470. Petitioner also cites *Anderson,* a case decided by Washington's intermediate appellate court where the evidence was held to be sufficient to establish the noncontrolled nature of the substance, implying that Petitioner is of the position that the State would have met its burden of proof if it introduced evidence similar to that in *Anderson.* While we do not decide here whether the same evidence presented in *Anderson* would have been sufficient to prove the substance as noncontrolled under Maryland law, we observe that, in the present case, the State introduced "more" evidence than did the prosecution in *Anderson.* In *Anderson,* the evidence was sufficient to establish beyond a reasonable doubt that the substance was noncontrolled where the expert testified that he conducted three chemical tests on the white powder-like substance and eliminated 80 to 90 percent of all possible controlled substances. *Anderson,* 791 P.2d at 558. In comparison, the expert witness in the present case, Ms. Blankenship, testified that her scientific analysis eliminated all controlled dangerous substances and unequivocally stated that the rocklike substance she examined was a noncontrolled substance. If Petitioner accepts the evidence in *Anderson* as sufficient, there is less reason for him to challenge the sufficiency of the evidence in the present case.

evidence reasonably could not eliminate the possibility that the drugs recovered from her residence were for individual recreational use only). Because the State conducted only one chemical test to prove that the substance was not cocaine, the State was required to introduce sufficient evidence to eliminate effectively the remaining possible CDS's through other means. Such evidence may be circumstantial or direct, because "proof of guilt based in whole or in part on circumstantial evidence is no different from proof of guilt based on direct eyewitness accounts." *Smith,* 374 Md. at 534, 823 A.2d at 668 (citing *Eiland v. State,* 92 Md.App. 56, 607 A.2d 42 (1992), *rev'd on other grounds,* 330 Md. 261, 623 A.2d 648 (1993)).

The State introduced circumstantial evidence through the testimony of Tomlin and Officer Russell showing that if the substance Petitioner sold was a CDS, it could not have been any CDS other than cocaine. The transaction between Tomlin and Rivers occurred in an area known for illegal drug sales. Rivers told Mr. Tomlin that "he could really hook [Tomlin] up" with a "$30 piece." Tomlin, who had acted as a confidential informant for some twelve years and, in that role, purchased crack cocaine some 450 times, testified that he purchased the rocklike substance from Petitioner because it appeared to him to be crack cocaine. In addition to Tomlin's testimony, Officer Russell also testified that the substance Petitioner sold appeared to be a small "rock," wrapped in plastic, and that its appearance was consistent with a $40.00 piece of crack cocaine.[10]

---

**10.** We note that, based on a similar set of facts, the Supreme Court of Georgia rejected the defendant's challenge to the evidentiary sufficiency of his conviction. *Brown v. State,* 276 Ga. 606, 581 S.E.2d 35 (2003). In *Brown,* a police informant went to an area known for illegal drug sales and asked Brown for a "twenty," slang for a twenty-dollar rock of crack cocaine. The informant in *Brown* also testified that the substance Brown sold him appeared to be crack cocaine. The *Brown* court held that this circumstantial evidence, coupled with a subsequent determination that the rock was in fact not cocaine, was sufficient to convict Brown of distribution of noncontrolled substance. Compared to *Brown,* the case at bar proceeds upon a similarly compelling set of circumstantial evidence, if not more.

 The State also introduced direct evidence through the expert testimony of Ms. Blankenship, who performed a visual inspection as part of her scientific analysis and excluded all CDS's other than cocaine before she tested for the presence of cocaine. We resolve that visual or tactile inspection may be utilized in a process of elimination by an experienced and well-qualified expert in his or her scientific analysis to establish that a substance is not a controlled dangerous substance. The U.S. Supreme Court, in a different context, was of a nonetheless analogous view with respect to the use of visual inspection in a process of elimination conducted by well-qualified expert witnesses. In *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 156–57, 119 S.Ct. 1167, 1178, 143 L.Ed.2d 238, 255 (1999), a tire expert testified that he visually inspected the failed tire in question and employed a process of elimination in arriving at his opinion as to the cause of the failure. The Supreme Court noted that "[t]ire engineers rely on visual examination and process of elimination to analyze experimental test tires," and noted with approval that "an expert might draw a conclusion from a set of observations based on extensive and specialized experience." [11] *Id.* In the present case, Ms. Blankenship concluded that the substance was a noncontrolled substance based on her visual inspection of the substance and drawing upon her specialized experience with the scientific analysis of suspected controlled dangerous substances. As the Court of Special Appeals noted, Ms. Blankenship is a forensic chemist with thirteen years of experience and was accepted by the trial court as an expert witness in this case. She testified that

---

11. In *Kumho,* the Court questioned the reliability of the particular expert testimony in that case because, although "as a general matter, tire abuse may often be identified by qualified experts through visual or tactile inspection of the tire," "the question before the trial court was specific, not general." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 156, 119 S.Ct. 1167, 1178, 143 L.Ed.2d 238, 255 (1999). "The trial court had to decide whether this particular expert had sufficient specialized knowledge...." *Id.* In the present case, the qualifications of the expert witness, Ms. Blankenship, are not central to our analysis because Petitioner did not challenge, either during trial or on appeal, Ms. Blankenship's expertise and specialized knowledge in the scientific analysis of suspected controlled dangerous substances.

she performed a visual inspection of the substance as part of her scientific analysis, that the substance appeared to be a rocklike form, and that the rocklike substance did not physically resemble any CDS other than cocaine. Ms. Blankenship further testified, without objection that, based on her visual inspection, she eliminated all but one controlled substance, cocaine, from the range of all possible CDS's referenced in § 5–401 to –406:

Q. . . . could it be any other controlled dangerous substance?
A. No, the only controlled dangerous substance that comes into our laboratory as controlled, that appears to be a rocklike substance, is cocaine base.

The crux of Petitioner's argument concerning Ms. Blankenship's expert testimony is that a visual inspection of the substance, even if performed by an experienced chemist, cannot determine conclusively the chemical composition of the substance. Petitioner's argument is misdirected. Ms. Blankenship never testified that she positively identified the substance as cocaine. Rather, her uncontradicted testimony was that she excluded all other controlled dangerous substances through her visual inspection and then used a chemical analysis to determine that the substance was not in fact cocaine, followed by her conclusion that the substance was noncontrolled.[12] Petitioner's argument fails to appreciate that the record in this case is not one where the only examination of the substance was visual and where the visual inspection serves only to identify the substance. We distinguish the process of identification and the process of elimination, and highlight that the visual inspection performed by Ms. Blankenship served to both identify the substance and at the same time eliminate other possibilities with a reasonable degree of certainty.[13] In her testimony, Ms. Blankenship characterized

---

12. Because Petitioner did not object to Ms. Blankenship's testimony the second time she was asked whether the substance was noncontrolled, Ms. Blankenship's expertise to express such an opinion on this issue, following her visual inspection and chemical analysis, is a question not preserved for review. *See* Md. Rule 2–571(a).

13. Forensic scientists regularly employ in their analysis a variety of scientific techniques that serve such dual purposes. *See, e.g., People v.*

the substance as having a "rocklike" appearance, which limited the number of controlled substances that the substance possibly could be. Thus, a visual inspection as part of her scientific analysis nevertheless may narrow significantly the range of possible CDS's even if it does not determine conclusively the chemical composition of the substance. Furthermore, although Petitioner failed to raise this issue in this case, we agree with the Court of Special Appeals's conclusion that a highly experienced forensic scientist reliably could distinguish crack cocaine from certain other forms of controlled dangerous substances through visual inspection. *See United States v. Booker,* 260 F.3d 820, 823 (7th Cir.2001) (rejecting the claim that an expert witness could not reliably distinguish crack cocaine from raw cocaine through visual inspection).

Therefore, viewing all the abovementioned circumstantial and direct evidence in the light most favorable to the State, we conclude that a rational jury could have found, beyond a reasonable doubt, that the substance Petitioner distributed was a noncontrolled substance and that he violated § 5–617(a) of the Criminal Law Article.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.**

*Pizarro,* 110 Cal.App.4th 530, 3 Cal.Rptr.3d 21, 46–47 (2003) (citing NATIONAL RESEARCH COUNCIL, DNA TECHNOLOGY IN FORENSIC SCIENCE 51 (1992)) (analogizing forensic DNA profiling to a composite sketch and recognizing the dual purpose of these two methods: to identify the defendant as the perpetrator and to exclude others in the general population with a degree of certainty).