*Graham Schiff v. State of Maryland,* Case No. 725, September Term 2021.
Opinion by Wells, J.

## CRIMINAL LAW – STALKING – SUFFICIENCY OF THE EVIDENCE

A jury convicted appellant Graham Schiff of stalking, based on several letters and emails he sent to one Assistant State's Attorney (ASA#1) expressing his sexual desire for ASA#1 (among many other things) and correspondence he sent to another ASA (ASA#2) regarding ASA#1. Schiff challenged his conviction based on his assertion that the communications (1) did not constitute threatening conduct; (2) did not intend to cause ASA#1 serious emotional distress; and (3) did not constitute a "malicious, persistent pattern of conduct showing continuity of purpose." Here, the jury was charged with reviewing Schiff's conduct under Maryland Code Annotated, Criminal Law Article ("CR") § 3-802(a)(2), where a conviction rests on a jury's finding that the defendant "intends to cause or knows or reasonably should have known that the conduct would cause serious emotional distress to another." Schiff's correspondences, their quantity, and their content, when viewed in totality, satisfy each element of CR§ 3-802(a)(2) proving that Schiff stalked ASA#1.

## CRIMINAL LAW – HARRASSMENT – SUFFICIENCY OF THE EVIDENCE

Similarly, the same evidence was sufficient to convict Schiff of harassing ASA#1 under CR § 3-803(a). In this instance, the prohibited conduct is where one maliciously engages in a course of conduct that alarms or seriously annoys the other (1) with the intent to harass, alarm, or annoy the other; (2) after receiving a reasonable warning or request to stop by or on behalf of the other; and (3) without a legal purpose. To satisfy the second element of the statute, we focus only on those communications Schiff sent to ASA#1, her colleague, and the circuit court after ASA#1 obtained a peace order against Schiff. We hold that the peace order constituted a warning for Schiff to cease corresponding with ASA#1 directly or indirectly, such as through her colleague. Further, the correspondence was meant to harass ASA#1 and was without legal purpose.

## CONSTITUTIONAL LAW–FREEDOM OF SPEECH

Despite Schiff's arguments to the contrary, his correspondence to ASA#1 and her colleague was not protected speech under the First Amendment.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 725

September Term, 2021

_____

GRAHAM SCHIFF

v.

STATE OF MARYLAND*

_____

Wells, C.J.,
Shaw,
Harrell, Glenn T., Jr.,
    (Senior Judge, Specially Assigned)

JJ.

_____

Opinion by Wells, C.J.

_____

Filed: April 27, 2022

*Tang, Rosalyn and Albright, Anne K., JJ., did
not participate in the Court's decision to
designate this opinion for publication pursuant to
Rule 8-605.1.

Several years before this appeal and in a different case, an Assistant State's Attorney with the Montgomery County State's Attorney's Office ("ASA#1")[1] secured a stalking conviction against appellant Graham Schiff in the Circuit Court for Montgomery County. For the two years following that trial, Schiff sent a total of eight letters or e-mails directly to ASA#1 or to others professionally connected to her. Each correspondence detailed, to varying degrees, Schiff's amorous feelings for ASA#1, who wanted no contact with Schiff. As a result, the State charged Schiff with stalking and harassing ASA#1. Ultimately, a jury empaneled in the Circuit Court for Montgomery County convicted him of both offenses. Schiff timely appealed both convictions, presenting the following two issues which we have slightly rephrased[2]:

1. Is the evidence sufficient to sustain the convictions for stalking and harassment?

2. Were Schiff's communications that formed the basis of the stalking and harassment convictions outside the protection of the First Amendment?

For reasons we explain, we answer "yes" to both questions and affirm.

---

[1] We will use "ASA#1" to protect the privacy of the victim.

[2] Schiff's questions presented, verbatim, were:

1. Is the evidence sufficient to sustain the convictions for stalking and harassment?
2. Is the evidence sufficient to sustain the convictions because the correspondence that formed the basis of the stalking and harassment convictions were based on protected speech?

**PROCEDURAL AND FACTUAL BACKGROUND**

**Schiff's Original Stalking Conviction and His First Encounters with ASA#1**

In early 2018, Schiff was convicted of stalking in a case ASA#1 prosecuted in Montgomery County. Later, after a post-conviction hearing arising from that case, a patrol officer who was involved, Officer Melissa Weber, gave ASA#1 a letter from Schiff dated March 12, 2018. The letter was addressed "To Whom It May Concern," and discussed the facts of Schiff's stalking case. The "p.p.s" at the end of the letter explained that upon Schiff's release, he planned to create a "State's Attorney Barbie," which would come with certain "catch phrases," including "Mr. Schiff, I legally consent to you having your way with me," and "Mr. Schiff, it's not weird at all I look like a runway model, am pushing 30, making six figures, and have no wedding ring. I just haven't met the right guy yet, it has nothing to do with my personality."

**Schiff's Direct Communications to ASA#1**

On June 27, 2019, Schiff sent an e-mail to ASA#1 and ASA#2, another prosecutor in the Montgomery County State's Attorney's Office.[3] The e-mail was addressed to ASA#2, but Schiff noted in the first sentence that ASA#1 was copied on the e-mail, adding a heart ("<3") in parentheses next to her name. The e-mail mentioned a post-conviction petition Schiff had filed related to his stalking charge, and asked ASA#2 questions about her connection to the victim in the stalking case, which he twice acknowledged she was not legally obligated to answer. Schiff also described two strange occurrences he observed

---

[3] To protect this person's privacy, we shall refer to her only as "ASA#2."

2

after having previously written to ASA#1, speculating they were the result of ASA#1 sharing what he had written to her with others, all of whom, he claimed, were conspiring against him.

Because what Schiff wrote to ASA#1, ASA#2, and two judges, forms the basis of his convictions for harassment and stalking of ASA#1, we reproduce the relevant sections of his correspondence in this opinion. We regret the length of the quoted passages but replicate them to show the extent and the content of Schiff's writings.

On July 14, 2019, ASA#1 received an e-mail from Schiff with the subject line, "Cease and Desist." In this email, Schiff wrote that he had learned about statements ASA#1 made about him that he considered slanderous. He also wrote:

> I cannot help but notice that this aggression towards me happened nearly a week after I filed my most recent motion and almost two weeks after I lost contact with you. I'm assuming you considered some[]thing(s) I wrote in those e-mails to be offensive, and/or you are threatened by the fact you framed me for a crime I didn't commit (<3).
> …
> I would like to firmly apologize for certain statements I made towards you in these e-mails. I should have been more considerate towards your sensitivity. And I am truly sorry.

Schiff then discussed facts relating to another legal proceeding, and said "I would like to make clear, I am not using this . . . thing to excuse whatever offensive statements I made towards you[.]"

Two days later, on July 16, 2019, ASA#1 received another e-mail from Schiff, with a subject line that included the name and case number of another case ASA#1 was prosecuting. Schiff relayed information he had obtained about that case and recounted

3

some details of his own case. He also wrote that he had learned of ASA #1's hometown[4], which he described as a "prison cult town." He added, "Because of how hot I think you are, I was afraid to bring this up. But after recent events (you going . . . Crazy on me) I think it's time we talk about this." Schiff returned to talking about the stalking case ASA#1 prosecuted against him and wrote:

> When you make up stories about me, it offends me because I'm assuming you have a boyfriend or fiancé, who is probably involved in this somehow. And you need to continue the false narrative I'm a dangerous pervert[.]

Schiff discussed his own problems and offered to help ASA#1 with the case he had previously referenced. He wrote that he wanted ASA#1 in his life and apologized for his behavior because he "was still psychotic." Nonetheless, Schiff wrote that he was "not mentally ill" and that he needed "to get over" ASA#1, but was still attracted to her, calling her "the hottest girl [he'd] ever seen." Schiff described himself as ASA#1's "biggest fanboy."

Schiff then described someone else he knew from ASA #1's hometown. He continued:

> Anyway, I'm sure you'll have me arrested and sent back to prison for writing this, so I'll stop here, but once again, I hope you're doing okay.

> There are certain individuals connected to [NAME OF FAMILY RELATED TO PREVIOUS STALKING CASE] who I may be e-mailing soon, and I may include you in those e-mails.

> Therefore, I just want to once again clarify:

---

[4] ASA#1 testified that at no point did she ever communicate her hometown to Schiff.

4

I am not unstable, nor am I a threat to you. To be honest, I have had a hard time rationalizing that if I had stayed in school, we could've worked together, but it is what it is, I can find someone else.

**ASA#1's Peace Order against Schiff and Subsequent Communications**

The next day, July 17, 2019, ASA#1 obtained a peace order against Schiff. A hearing was scheduled for the following week. After the peace order was issued, on the evening of July 17, Schiff sent ASA#1 another e-mail. He said he wanted to discuss some of the motions he had filed in his post-conviction case. He then wrote:

> Otherwise, you wanna hear something crazy? Someone filed a peace order against me today, hearing took almost three hours. I thought it might be you, but I looked over the e-mails I sent you, and there were legal grounds to send each one of them, I had no intention to alarm or annoy you, furthermore you never told me to stop, so I just assumed you enjoyed my messages, you were just too busy with work to respond. Thus, what kind of idiot judge would give a T[emporary]P[rotective]O[rder] for that?

He then wrote:

> Anyway, look, with all this weird stuff happening to me, I've been thinking ……. Any chance you wanna be my girlfriend?
>
> I really feel a connection between you and I, and I could really use some support against whatever psycho filed this crazy TPO.

Schiff added the details of his peace order hearing and stated that he was waiting to be physically served with the order.[5] He then stated, "If you're too busy to reply……….. Maybe I'll see you next Friday at my hearing?"

---

[5] Schiff maintains in his brief to this Court that at the time he wrote this e-mail, he had not yet been served. ASA#1 also testified that she "guess[ed]" that was the case. However, we find no clear evidence in the record, nor do the parties direct us to any, that shows definitively whether Schiff was served with the Peace Order before or after sending the e-mail that evening.

On July 18, 2019, ASA#1's co-worker, ASA#2, received an e-mail from Schiff, that began "Yo [ASA#2], it's Graham Schiff. So I'm currently legally barred from contacting the most beautiful girl in the world, and I figured I'd hit you up." In the e-mail, Schiff discussed an organization through which he thought he might have recognized ASA#2. Schiff added "Please answer, don't play games with me [ASA#2], I'm trying to be nice here." In the post-script, Schiff wrote:

> Did you actually read [ASA#1's] "Peace Order" against me? I'm gonna be civil here, but holy FUCK what a mentally unstable histrionic retard. She could've just told me to stop contacting her, instead she concocted a story she's scared I'm gonna harm her. She even included extremely private information I gave her about certain cases, which puts me in danger. Like, I am just lost for words.

Upon receipt, ASA#2 forwarded the e-mail to ASA#1, writing "Another one."

The peace order hearing was held on July 26, 2019. Schiff testified that he could understand why the letters he had sent would cause ASA#1 concern. He admitted to having looked her up on the internet, which he acknowledged was "freaky."

ASA#1 never responded to any of Schiff's communications. Initially, the Montgomery County State's Attorney's Office decided not to take action against Schiff to avoid exacerbating the situation. But the office decided to contact the police after July 2019, when Schiff's letters became more numerous and contained "more concerning information." After consulting with the police, on September 26, 2019, the State filed a criminal information in the Circuit Court for Montgomery County, charging Schiff with stalking, failure to comply with a peace order, and harassment. A bench trial was scheduled for March 2020, with the Honorable Gary Bair presiding.

6

In the meantime, Schiff wrote a four-page letter to Judge Salant, who had presided over Schiff's original stalking trial.[6]  In the letter, Schiff discussed at length his original conviction and why it was illegal.  He also wrote about some motions that Judge Salant had not yet addressed and asked that Judge Salant dismiss his case "ASAP."  Schiff briefly referenced the new stalking case against him, putting four hearts in parentheses after ASA#1's name.  On the next page, ASA#1's initials appeared inside a heart in the middle of a sentence. On the final page of the letter, the last line before the post-script read: "[ASA#1] makes me . . .  cum in my pants."  Beside his signature, Schiff added another heart with ASA#1's full name written inside.  The first post-script asked Judge Salant if he was aware of another prosecutor that he'd heard was beautiful but doubted could be more beautiful than ASA#1.  Schiff's third post-script asked that Judge Salant be put on Schiff's "new case with [ASA#1]," and then added three hearts with ASA#1's initials.

Later, Schiff wrote a letter to Judge Bair primarily providing a backstory on his interactions with ASA#1.  Schiff wrote that one day, a friend had dropped him off on a street in Bethesda, not far from where his parents live and where he was living at the time. He then wrote about applying for a job at "Sunrise," an assisted living facility located there. When trying to connect to the Wi-Fi network, Schiff wrote that he noticed that one of the available network names referenced a university and recalled that he'd discovered ASA#1 attended that university. Schiff ended this sentence with a heart with "[ASA#1's initials]"

---

[6] Again, we regret reprinting these communications in detail but the letters to Judges Salant and Bair form part of one of Schiff's claims of error.

7

written inside. Schiff then explained how in June 2019, he e-mailed ASA#1 about his previous stalking case in an effort to get his convictions dropped. He wrote:

> The following week, an unnamed source gave me a disturbing report: Goddess had seen me that day [outside of a grocery store] . . and was telling people including people outside the SAO (like [BOTH OF ASA#1'S PARENTS' FIRST NAMES], for example) that she believed I was there to do something offensive to her.[7]

Schiff concluded that in light of all these events his current charges were illegal, laying out additional reasons in the final five paragraphs of the letter. Schiff ended by writing, "Girls who commit perjury turn me the fuck on."

ASA#1 testified that until she saw the letter addressed to Judge Bair, she had forgotten about a conversation she had had with her father about her concerns over the situation with Schiff. She testified that the conversation had taken place inside her apartment,[8] after she had received either the first or second letter from Schiff at the end of June 2019.

---

[7] Indeed, ASA#1 testified that in early June of 2019, as she was driving in her car, she recognized Schiff walking down the street near where she lived. At the time, she did not believe he had seen her, and she remained in her car.

[8] We presume ASA#1 was implying the conversation with her father had taken place over the telephone, since she also testified that at the time of the conversation, she was the only person in her apartment.

**Trial on Schiff's Stalking and Harassment of ASA#1**

A jury trial was held May 24-25, 2021, the Honorable Sharon Burrell presiding.[9] Schiff represented himself, did not testify, and did not present any witnesses in his defense. Witnesses for the State included ASA#1, Officer Weber, Captain Dave McBain (who conducted the investigation after the State's Attorney's Office informed the police of Schiff's repeated communications to ASA#1), and ASA#2. ASA#1 testified that the communications from Schiff—as well as the trial itself—caused her "serious emotional distress" and that she had been in therapy for several years as a result of Schiff's communications. At trial, ASA#1 testified that the situation had upended her life, causing her anxiety and requiring her to adjust her living and security arrangements. The jury found Schiff guilty of stalking and harassment. The court sentenced him to five years' incarceration, with all but 707 days suspended for the stalking conviction, and 180 days, concurrent, for the harassment conviction. Schiff was given credit for 707 days and placed on a period of probation, a specific condition of which was not to contact ASA#1. This timely appeal followed.

## STANDARD OF REVIEW

"When a sufficiency challenge is made, the reviewing court is not to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt'; rather, the duty of the appellate court is only to determine 'whether, after viewing

---

[9] Previously, a bench trial before Judge Bair resulted in a conviction, however, Judge Bair granted Schiff's motion for a new trial and reset the case for a jury trial before a different judge.

the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Albrecht*, 336 Md. 475, 479 (1994) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1999) (emphasis in *Jackson*)). "Generally, if there are evidentiary facts sufficiently supporting the inference made by the trial court, the appellate court defers to that fact-finder instead of examining the record for additional facts upon which a conflicting inference could have been made, and then conducting its own weighing of the conflicting inferences to resolve independently any conflicts it perceives to exist." *State v. Smith*, 374 Md. 527, 547 (2003). "Our concern, therefore, is not whether the verdict was in accord with the weight of the evidence but rather, whether there was sufficient evidence produced at trial 'that either showed directly, or circumstantially, or supported a rational inference of facts which could fairly convince a trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt.'" *Galloway v. State*, 365 Md. 599, 649 (2001) (quoting *State v. Sowell*, 353 Md. 713, 726 (1999)).

For constitutional claims, "our application of the law to the facts is *de novo*." *Khalifa v. State*, 382 Md. 400, 417 (2004).

# I. THE EVIDENCE IS SUFFICIENT TO SUSTAIN THE STALKING AND HARASSMENT CONVICTIONS.

## *Stalking*

### A. Parties' Contentions

Schiff contends there was insufficient evidence to sustain his stalking conviction, since (1) he did not engage in any threatening conduct; (2) he did not intend for his

10

communications to cause ASA#1 serious emotional distress; and (3) his communications did not constitute a "malicious, persistent pattern of conduct showing continuity of purpose." In support of his first two contentions, Schiff asserts that his communications were civil, complimentary of ASA#1, and did not contain any threats or suggestions of violence. Further, he argues most of his correspondences were not directed to ASA#1 but to others, and that he did not ask that his communications be relayed to ASA#1. Finally, Schiff contends that the eight letters or e-mails sent over a near-two-year period—only three of which were addressed to exclusively ASA#1—cannot be classified as "persistent." And besides, he argues, all of the communications discussed legal matters.

The State counters, first, that Schiff's arguments that his communications do not amount to threatening conduct and were "simply too few, far between, and varied" to constitute a "course of conduct" for the purposes of stalking, are waived, because he did not argue them with particularity in his motion for a judgment of acquittal. The State concludes that the only arguments that Schiff preserved for appeal are that (1) he could not have reasonably known his conduct would cause ASA#1 emotional distress because he was never informed his communications were having that effect, and that (2) once he was served with the Peace Order, he did not send any further communications to ASA#1.

The State asserts that even those preserved arguments are unavailing, since Schiff's communications after the Peace Order were made to persons directly connected to ASA#1, and the jury could reasonably infer Schiff knew such persons would share the messages with ASA#1. The State further avers that Schiff's communications constitute a "malicious course of conduct," in that the five letters or e-mails Schiff sent in June and July 2019 alone

11

would constitute a persistent series of acts, and that Schiff's obsession with ASA#1 was the common thread running through all of his communications. Finally, the State argues the evidence sufficiently shows that Schiff knew or reasonably should have known his communications would cause ASA#1 emotional distress, because several of them explicitly acknowledged that ASA#1 might have been offended or threatened by his previous messages. Further, the content of the messages themselves—describing ASA#1 as a "State's Attorney Barbie" with whom Schiff could "have his way with," his knowledge of ASA#1's hometown, the location of her apartment, and a private conversation she had had with her father in the apartment—are so unsettling that a reasonable person would be aware of how distressing these revelations would be to ASA#1.

### B. Analysis

#### 1. Waiver

Rule 4-324(a) provides in part, "The defendant shall state with particularity all reasons why the motion [for judgment of acquittal] should be granted." Accordingly, an appellant "is not entitled to appellate review of reasons stated for the first time on appeal." *Starr v. State*, 405 Md. 293, 302 (2008) (internal quotations and citations omitted). *See also Bates v. State*, 127 Md. App. 678, 691 (1999) ("A defendant may not argue in the trial court that the evidence was insufficient for one reason, then urge a different reason for the insufficiency on appeal in challenging the denial of a motion for judgment of acquittal."), *overruled on other grounds by Tate v. State*, 176 Md. App. 365 (2007). Applying Rule 4-324, we agree with the State that Schiff did not preserve his "course of conduct" argument. He did not state with specificity this objection at the time of the motion for judgment.

12

But we conclude that his argument that his conduct was not threatening *is* preserved, in addition to his argument that he did not intend to cause ASA#1 serious emotional distress. However, "an appellant/petitioner *is* entitled to present the appellate court with 'a more detailed version of the [argument] advanced at trial,'" but this does not include arguments that are not at least "reasonable offshoots" of the arguments presented. *Starr*, 405 Md. at 304 (quoting *Sifrit v. State*, 383 Md. 116, 136 (2004)) (emphasis added).

In Schiff's oral motion for judgment of acquittal, he at least inferred his "not threatening" argument as part of his insufficiency argument, albeit not in the same framework he presents on appeal. In his oral motion, when arguing that his constitutional rights to effective counsel and free speech were violated, Schiff asserted that he should not have been punished for his speech,

> [a]s long as the content itself does not reach criminal liability **for something like actually threatening someone**. Or something that is a specific charge for, for written or spoken speech, then, yes, absolutely. And I believe it complies with the provision of the stalking law which protects against authorized, required or protected by local, state or federal law.

We determine that the issue of whether Schiff's conduct was threatening is at least a "reasonable offshoot" or "a more detailed version" of the argument he asserted at trial. Therefore, we will address it.

### 2. The Law

Section 3-802(c) of the Maryland Code, Criminal Law Article ("CR") prohibits stalking. Subsection (a) defines stalking as

> a malicious course of conduct that includes approaching or pursuing another where:

13

(1) the person intends to place or knows or reasonably should have known the conduct would place another in reasonable fear:

      (i)     1. of serious bodily injury;

                2. of an assault in any degree;

                3. of rape or sexual offense as defined by §§ 3-303 through 3-308 of this title or attempted rape or sexual offense in any degree;

                4. of false imprisonment; or

                5. of death; or

      (ii) that a third person likely will suffer any of the acts listed in item (i) of this item; or

(2) the person intends to cause or knows or reasonably should have known that the conduct would cause serious emotional distress to another.

Md. Code Ann., CR § 3-802(a). Subsection (b) exempts conduct that is:

(1) performed to ensure compliance with a court order;
(2) performed to carry out a specific lawful commercial purpose; or
(3) authorized, required, or protected by local, State, or federal law.

*Id.* at (b). Section 3-801 defines a "course of conduct" as "a persistent pattern of conduct, composed of a series of acts over time, that shows a continuity of purpose." *Id.* § 3-801.

### *Threatening conduct*

Schiff's argument that he did not engage in any threatening conduct is misplaced. While CR § 3-802(a)(1) requires that the conduct create a reasonable fear of some physical harm, CR § 3-802(a)(2)—the subsection of the statute the jury was provided in Schiff's case contains no such requirement. It requires only that an accused know or should know the malicious course of conduct will cause another person serious emotional distress. For this same reason, Schiff's assertion that *Hackley v. State*, 389 Md. 387 (2005) demonstrates

14

the required egregiousness of conduct for a stalking conviction, is incorrect.[10]  There, the Court of Appeals upheld Hackley's stalking conviction after he left letters with express death threats on the victim's car on three occasions, and was observed driving in her neighborhood, all within one month.  *Id.* at 389-91.  But the language of the stalking statute at that time was akin to *only* the current subsection (a)(1), as it defined stalking as "a malicious course of conduct that includes approaching or pursuing another person with intent to place that person in reasonable fear: (i) *Of serious bodily injury or death*; or (ii) *That a third person likely will suffer serious bodily injury or death*." *Hackley*, 389 Md. at 392 (quoting Maryland Code, Art. 27, § 124 (1996 Repl. Vol., 2001 Supp.)) (emphasis added).  The statute was amended in 2016 to include the provision for causing serious emotional distress. 2016 Md. Laws Ch 544 (S.B. 278); 2016 Md. Laws Ch. 545 (H.N. 155). Thus, *Hackley* does not provide any guidance as to the threshold of conduct that constitutes stalking under CR § 3-802(a)(2).

In fact, our search does not reveal any Maryland cases that analyze a stalking conviction under CR § 3-802(a)(2).  We conclude that the distress reasonably caused by the malicious course of conduct in CR § 3-802(a)(2) need not result from express physical threats—or even any type of express threat.  Although we find this to be unambiguous from the statute's plain language, this concept is borne out in the statutory history just discussed. Specifically, we mean that the statute previously covered only conduct that evinced an intent to cause another fear of physical harm, and thereafter was amended to cover

---

[10] To our knowledge, *Hackley* is the only reported Maryland case that analyzes a sufficiency of the evidence claim for a stalking conviction.

15

*additional* conduct that would reasonably cause severe emotional distress. Although we believe a rational factfinder could read Schiff's communications to contain, at the very least, implicit threats of unwanted future contact with ASA#1 (indeed, ASA#1 testified that she felt the need to leave her home and stay with someone else at one point after receiving the letters and to update her security), we do not believe the absence of threats would necessarily defeat a stalking conviction under CR § 3-802(a)(2).

Instead, we hold that the critical metric in CR § 3-802(a)(2) is the objective knowledge that the perpetrator's conduct would cause another person severe emotional distress. We are further persuaded by this interpretation after reviewing other jurisdictions' similarly worded statutes that do not require any type of express threat or assaultive conduct to satisfy an "emotional distress" element.

For example, Florida's stalking statute prohibits "engag[ing] in a course of conduct directed at a specific person which causes substantial emotional distress to that person and serves no legitimate purpose." Fla. Stat. Ann. § 784.048(1)(a). The District Court of Appeals for the Fourth District of Florida has focused its analysis under the statute on whether "a reasonable person in the same position as the victim" would "be put in distress when subjected to such conduct," rather than on whether the conduct itself contained express threats. *DiTanna v. Edwards*, 323 So. 3d 194, 202–03 (Fla. Dist. Ct. App. 2021). In *DiTanna v. Edwards*, the court held the statute's objective emotional distress prong was satisfied where the appellant had advised a neighbor "to stay away and to keep her son away from appellee, as well as contact[ed] other friends to warn them of listening devices, suspected criminal conduct of appellee, and suspicions of misbehavior at appellee's

16

workplace." *Id.* Although the *DiTanna* appellant's conduct may arguably have been more

*defamatory* to appellee than Schiff's speech was to ASA#1, the *DiTanna* appellant's

conduct contained no threats of violence or assaultive conduct. *Id.* at 203.

Another example is Michigan's stalking statute, which prohibits "harassment,"

defined as:

> conduct directed toward a victim that includes, but is not limited to, repeated
> or continuing unconsented contact that would cause a reasonable individual
> to suffer emotional distress and that actually causes the victim to suffer
> emotional distress. Harassment does not include constitutionally protected
> activity or conduct that serves a legitimate purpose.

Mich. Comp. Laws Ann. § 750.411h. In *Hayford v. Hayford*, the Court of Appeals of

Michigan held that it was sufficient to sustain the trial court's finding that a son

experienced—and a reasonable person also would have experienced—significant

emotional distress, where the son testified that his father's behavior "caused him to feel

stressed, embarrassed, and harassed," and where his father's actions "penetrated his school,

work, and family life and affected other members of his family, which caused further

distress." 279 Mich. App. 324, 332 (2008). The court explained that the "emotional

distress" portion of the statute "does not require that the petitioner feel afraid, nor does it

mention fear." *Id.* at 331. We believe this principle is analogous to our conclusion that

conduct constituting stalking under CR § 3-802(a)(2) need not be threatening. Since

serious emotional distress in *any* of its potential forms (for example, severe embarrassment

or stress), could sustain a stalking conviction under CR § 3-802(a)(2), then the conduct that

constitutes stalking need not exclusively be the type that causes fear.

17

### *Intent to cause serious emotional distress*

Schiff's argument that the intent element of CR § 3-802(a)(2) is not satisfied because he did not intend for his communications to cause ASA#1 serious emotional distress is unavailing. To begin, we point out that the inquiry under CR § 3-802(a)(2) does not end with Schiff's subjective intentions as he argues. Regardless what the actor actually *intends* to do, if a reasonable person would know his or her conduct would cause another person serious emotional distress, then the intent element of CR § 3-802(a)(2) is satisfied.

We hold that a rational factfinder could have inferred that Schiff knew his communications were causing ASA#1 serious emotional distress, based on several statements in his letters that acknowledged that ASA#1 might feel threatened or scared by him and apologized for his communications:

> July 14 e-mail
>
> - "I'm assuming you considered some[]thing(s) I wrote in those e-mails to be offensive, and/or you are threatened by the fact that you framed me for a crime I didn't commit (<3)."
>
> - "I would like to firmly apologize for certain statements I made towards you in these e-mails. I should have been more considerate towards your sensitivity."
>
> - "I would like to make clear, I am not using this . . . thing to excuse whatever offensive statements I made towards you."
>
> July 16 e-mail
>
> - "I am sorry if I scared and/or offended you with something I said[.]"
>
> - "I want to clarify why I spoke to you that way. The last time I saw you (3/6/18), I was still psychotic . . . ."

18

- "I stupidly said 'Oh, I need to go e-mail [ASA#1], and tell her how hot I think she is.' I was wrong to do that, and I'm sorry."

- "Anyway, I'm sure you'll have me arrested and sent back to prison for writing this . . . ."

- "Therefore, I just want to once again clarify: I am not unstable, nor am I a threat to you."

- "P.S.: Just remember, it's not harassment unless you tell me to stop."

Schiff's frequent need to "remind" ASA#1 that he was not a threat to her and to apologize for things he had said could lead a rational juror to infer that Schiff realized his communication had led ASA#1 to consider him a threat, and yet he continued to contact her.

We also conclude that a rational factfinder could have found the objective standard of CR § 3-802(a)(2) satisfied—that a reasonable person in Schiff's position would have known his communications would cause ASA#1 serious emotional distress. We disagree with Schiff's characterization of his communications as mostly complimentary toward ASA#1. A reasonable person could have found his comments alarming. For example, Schiff accused ASA#1 of framing him for a crime he didn't commit, alleged she might have been involved in a criminal conspiracy against him, and accused her of making slanderous statements about him. Further, Schiff called ASA#1 "Crazy," stated she had "an attitude problem," and called ASA#1 a "mentally unstable histrionic retard"[11] to her colleague, ASA#2. Viewing all of these statements (and others) together, could lead a trier

---

[11] We in no way condone any of Schiff's language and only repeat it to underscore the inappropriateness of his language toward ASA#1.

of fact to reasonably conclude that they would cause ASA#1 serious emotional distress. Schiff's supposedly complimentary statements—calling ASA#1 a "goddess" and the "most beautiful girl in the world," and comparing her to a "runway model"— are designed, one could reasonably infer, to cause her more emotional distress, given Schiff's obsession with ASA#1. We fail to see how such unsolicited comments could be considered "complimentary" as Schiff suggests.

As for the second part of Schiff's argument, we also conclude that a rational factfinder could infer that Schiff should have known that his communications would be shared with ASA#1 because they were addressed to persons who regularly encountered her at work, such as ASA#2. The communications were also sent to people involved in the prosecution against Schiff, specifically, Officer Weber, and, again, ASA#2.[12] The plain language of CR § 3-802 does not require that communication or contact be made directly to the person being stalked.[13] A juror could reasonably infer that the two communications

---

[12] For reasons that will be discussed below, we decline to rely on Schiff's letters to Judges Salant and Bair to uphold Schiff's stalking (or harassment) conviction.

[13] The rationale of the Supreme Court of Montana in a case cited in the State's brief is compelling. That court rejected a similar contention by a defendant under a stalking statute, which, like CR § 3-802, contained no express requirement that the communication be made directly to the victim. The court explained:

Communicating through a third party whom the stalker knows is likely to relay the fact of contact, and hence produce the desired effect of harassing or intimidating the victim, constitutes an "action, device or method" of stalking. To hold otherwise would defeat the clear purpose of the stalking statute by permitting a stalker to intimidate and harass his intended victim simply by communicating his threats to third parties who (the stalker knows and expects) will inform the victim.

not addressed to ASA#1 were nonetheless part of a course of conduct in which Schiff was "pursuing" ASA#1. CR § 3-802(a). This was particularly evident when Schiff stated in his e-mail to ASA#2 that he was writing to her because he was prohibited from contacting ASA#1.[14] But, even if the communications not directly addressed to ASA#1 were set aside, we cannot say that it would be irrational for a factfinder to conclude that Schiff should have known his e-mails to ASA#1 on June 27, July 14, July 16, and July 17 of 2019, would cause ASA#1 serious emotional distress. Within those e-mails, Schiff made clear that he had had discovered ASA#1's hometown; he said he had heard she was making supposedly slanderous statements about him to others; he expressed that he had thought about marrying and starting a family with ASA#1; he asked her to be his girlfriend; and he acknowledged that the last time she had seen him, he "was still psychotic" and had "delusions" about her. A rational juror could infer that Schiff should have known sharing these desires and his knowledge of ASA#1's personal details, combined with ASA#1's role as a prosecutor against Schiff, and that she had not responded to any of his communications, would cause ASA#1 serious emotional distress.

---

*State v. McCarthy*, 980 P.2d 629, 632 (Mont. 1999) (internal quotations and citation omitted).

[14] Specifically, he wrote: "So I'm currently legally barred from contacting the most beautiful girl in the world, and I figured I'd hit you up."

21

## *Course of conduct*

Although this argument was not preserved, we nonetheless address it given the dearth of case law that expressly analyzes what course of conduct constitutes stalking or harassment. Moreover, this analysis would not change the outcome of this appeal even if preserved, because we would hold that a rational factfinder could have found Schiff's communications constituted a "malicious persistent pattern of conduct."

Based on our research, there are very few cases that give even a passing reference to CR § 3-801 or its predecessors, Maryland Code, Art. 27, §§ 123(a), and 124 (a)(2) (1996 Repl. Vol., 2001 Supp.) (regarding stalking and harassment offenses respectively, from which no substantive changes were made). At Schiff's request we turn again to *Hackley*. There, Hackley's four contacts with the victim—three letters and a drive-by of her home within a one-month period—were deemed a "malicious course of conduct" under the statute. 389 Md. at 389–91. We also review *Galloway v. State*, where the Court of Appeals upheld Galloway's harassment conviction where he sent over 130 letters to his kidnapping and stalking victims. 365 Md. 599, 605–06 (2001). *Galloway* does not expressly analyze the "course of conduct" requirement. And neither *Galloway* nor *Hackley* establishes a minimum number of contacts necessary for a stalking or harassment conviction.

We decline to read into the statutes a minimum number of contacts necessary to sustain a stalking or harassment conviction when the legislature has not chosen to do so and when we can find no precedent for doing so. Further, we decline Schiff's request to read into the statute a minimum number of contacts because the words used in the statute, "persistent," "pattern," and "series" have commonly understood meanings and thus are

22

capable of being interpreted and applied by the trier of fact. We note that a similar contention was addressed by the Supreme Court of Montana in *McCarthy*, where the appellant claimed his two communications were not sufficient for "repeatedly" harassing and intimidating the victim under the statute. The court opined:

> We disagree that two unwanted attempts at contact with the victim is legally insufficient to support a conviction for stalking. As we stated in *Martel,* "Words such as 'repeatedly,' 'harassing,' and 'intimidating' have commonly understood meanings. 'Repeatedly' means 'more than once.'"

*McCarthy*, 980 P.2d at 632 (quoting *State v. Martel*, 902 P.2d 14, 19 (Mont. 1995)).

Further, were we to look to *Hackley* for comparison, the quantity of contacts—three letters and one drive-by in one month—are not so different from Schiff's case. Setting aside the communications Schiff did not send directly to ASA#1, he sent four e-mails directly to ASA#1 within a two-month period. A rational factfinder could find this to be "a persistent pattern of conduct, composed of a series of acts over time." CR § 3-801. A rational trier of fact could find those communications demonstrated "a continuity of purpose," *id.*, in that they all concerned, to some degree, Schiff's obsession with ASA#1.

In sum, we hold that a rational factfinder, "after viewing the evidence in the light most favorable to the prosecution . . . could have found the essential elements" of stalking beyond a reasonable doubt. *Albrecht*, 336 Md. at 479.

### *Harassment*

#### A. Parties' Contentions

Schiff asserts none of the elements of the harassment statute could have been found beyond a reasonable doubt in this case. *First*, he contends that the State failed to prove

that he acted with the requisite intent "to harm, alarm, or annoy" ASA#1. *Second*, Schiff argues that he "did not ignore a request to stop communicating with" ASA#1, since he did not address or direct that any communications be delivered to ASA#1 after he received the Peace Order. *Finally*, Schiff maintains that each communication he sent after he received the Peace Order had a legal purpose, thereby taking them outside of conduct that constitutes harassment.

The State counters that some of Schiff's arguments are unpreserved. The State says that during Schiff's motion for judgment of acquittal, he raised only two arguments regarding the harassment charge: (1) that he did not contact ASA#1 directly after receiving the Peace Order, and (2) his conduct was protected by the First Amendment.[15] The State counters Schiff's "no direct contact" argument by, *first*, asserting that a factfinder could have found Schiff ignored a reasonable request to stop communicating with ASA#1, since he sent ASA#1 an e-mail the evening of the day she obtained the Peace Order against him. A rational juror could have not believed Schiff's testimony when he claimed not to know who obtained the Peace Order against him. *Second*, the State argues, a reasonable factfinder could infer that Schiff was merely seeking to evade the Peace Order by sending messages to ASA#1's colleague and two judges, knowing they would relay the messages to her.

For the sake of completeness, the State addresses what it contends are Schiff's unpreserved arguments. Here, the State argues that merely because parts of Schiff's letters

---

[15] We reserve discussion of Schiff's First Amendment argument for the final section of this opinion, as both he and State address this argument separately.

24

relate to pending legal cases, that "does not isolate everything else within the letters from scrutiny." Finally, the State asserts that determining whether Schiff acted with the requisite intent "to harass, alarm or annoy" ASA#1 is akin to determining whether he knew his conduct would cause her serious emotional distress. Consequently, the State reiterates the argument it made regarding stalking, namely, that the letters Schiff sent ASA#1 after she obtained the Peace Order were threatening because they evinced an intent to continue harassing her since he was clearly aware of how distressing the letters were to ASA#1.

## B. Analysis

### 1. Waiver

We agree with the State's waiver argument: the only specific arguments Schiff raised in his motion for judgment of acquittal relating to harassment are: 1) that he did not contact ASA#1 directly after he was given reasonable warning to stop, and 2) that his communications were protected by the First Amendment. However, because there is a dearth of reported opinions on the issues Schiff raises in this appeal, we will analyze Schiff's unpreserved arguments regarding harassment.

### 2. The Law

Criminal Law § 3-803(a) prohibits harassment. There, harassment is defined as:

"follow[ing] another in or about a public place or maliciously engag[ing] in a course of conduct that alarms or seriously annoys the other:

(1) with the intent to harass, alarm, or annoy the other;
(2) after receiving a reasonable warning or request to stop by or on behalf of the other; and
(3) without a legal purpose.

25

## *Reasonable warning*

We begin by recognizing the "reasonable warning" requirement in the harassment statute. The parties do not dispute that the Peace Order constituted such a warning. Therefore, for the purposes of potential harassment, we shall consider only those communications that Schiff sent after he was aware of the contents of the Peace Order. This leads us to the one issue that is preserved: whether the communications Schiff sent—after the Peace Order was in place—ignored that warning.

*First*, we agree with the State that a rational factfinder could have inferred that Schiff sent the e-mail to ASA#1 the evening of July 17 after he was aware it was ASA#1 who had obtained the Peace Order against him. In that e-mail, Schiff explained that he had "thought it might be" from ASA#1, but then reasoned the Peace Order could not possibly have come from her, since all his e-mails to her served a legal purpose. Then he stated that "maybe" he would see her at the Peace Order hearing.

Viewing the evidence in the light most favorable to the prosecution, we conclude that a reasonable juror might have found Schiff's explanation to be defensive, his reference to seeing ASA#1 at the hearing coy, and his very e-mail to ASA#1 on the 'mystery' Peace Order to be beyond the possibility of coincidence—all indicative of Schiff's knowledge the Peace Order had been obtained by ASA#1. Thus, a factfinder could have inferred, at the very least, that Schiff had reason to know at the time of sending the July 17 e-mail that ASA#1 had taken steps to stop him from sending her any further communications. And since this Court has said that "[a] reasonable warning is one in which the defendant knows or has reason to know that his conduct is unwanted and is warned to stop," *Pall v. State*,

26

117 Md. App. 242, 248 (1997), the factfinder could have inferred that Schiff's *notice* of the Peace Order, combined with his apparent knowledge it was ASA#1 who had obtained it, constituted Schiff's receipt of a "reasonable warning" prior to his July 17 e-mail to ASA#1.

*Second*, a rational factfinder also could infer that Schiff's subsequent communication to ASA ASA#2—one of ASA#1's colleagues, and a person who Schiff included on a previous communication to ASA#1—ignored the reasonable warning he had received to stop such conduct. As we have observed, the e-mail begins with Schiff all but admitting that he was writing to ASA#2 since he was barred from contacting ASA#1. The most impactful part of the e-mail is the post-script calling ASA#1 a "mentally unstable histrionic retard." A rational trier of fact could have reasonably found that this e-mail had no purpose other than to have ASA#1's co-worker, ASA#2, pass on Schiff's message to ASA#1 and avoid the reasonable warning provided by the Peace Order. Consequently, we hold that a rational factfinder could have found beyond a reasonable doubt that Schiff ignored the "reasonable warning" element of the statute.[16]

### *Without legal purpose*

Next, Schiff's contention that his communications to ASA#1 and ASA#2 cannot constitute harassment because *each* letter or e-mail contained some commentary on a legal matter is unavailing. Although Schiff did not specifically raise this point in his motion for

---

[16] For reasons we discuss under the "Without legal purpose" heading below, we decline to categorize Schiff's subsequent communications to Judges Salant and Bair to be in violation of the reasonable warning.

27

judgment of acquittal, we nonetheless analyze these communications because they relate to the preserved argument just discussed—that the challenged communications Schiff sent after receiving the Peace Order were not in violation of a reasonable warning he received.

We agree with the State that merely because a piece of correspondence serves *some* legal purpose does not isolate all other parts of the correspondence from scrutiny. We see no reason why a factfinder could not separate out parts of a communication unrelated to a legal purpose and find those to be harassing. Thus, language from Schiff's July 17 e-mail where he asks ASA#1 to be his girlfriend, and language from his July 18 e-mail to ASA ASA#2 where he calls ASA#1 a "mentally unstable histrionic retard," are not so related to a legal purpose that they shield Schiff from scrutiny for harassment. Perhaps more to the point, as we view them, neither of those e-mails serve a clear "legal purpose" to begin with. Although they reference pending legal matters, they do not ask for any formal legal action, legal advice, or seek to start some legal process.[17]

But we have difficulty extending this same analysis to Schiff's letters to Judges Salant and Bair. Distinct from the communication to ASA#2, the judges do not work directly with ASA#1, such that it could be automatically assumed that they would share these communications with ASA#1. And we conclude, notwithstanding Schiff's references to his feelings for ASA#1 in both communications, and the fact that both letters are undoubtedly prohibited *ex parte* communications, that both letters primarily relate to

---

[17] *See, e.g.*, *Borkowski v. Balt. Cnty., Md.*, 492 F. Supp. 3d 454, 476 (D. Md. 2020) (holding the plaintiff's repeated filings of charges was not "without a legal purpose" under § 3-803 and thus was not harassment).

28

legal matters, pending cases and motions Schiff wanted each judge to act upon. For example, in Schiff's letter to Judge Bair—which has many more references to ASA#1—Schiff's discussion of ASA#1 is ostensibly for the purpose of explaining his behavior and demonstrating why his actions did not amount to stalking and harassment charges. And in his letter to Judge Salant, Schiff asked the judge to dismiss his pending case. We hold that the majority of both letters' references to ASA#1 were for a broadly legal purpose.

We acknowledge the inappropriateness of many of Schiff's references and the harmful effect they likely had on ASA#1 upon learning of them. For example, in Schiff's letter to Judge Salant, Schiff included hearts after ASA#1's name, referred to her as a "goddess," said that "love is painful," referring to the fact that ASA#1 refused to communicate with Schiff, and concluded by inappropriately referencing his sexual attraction to ASA #1. And in Schiff's letter to Judge Bair, Schiff repeatedly referred to ASA#1 as his "goddess," and said, "girls who commit perjury turn me the fuck on," a clear reference to ASA#1. Nonetheless, we decline to hold that communication (even when distasteful and inappropriate) *about* the victim to persons sufficiently removed from the victim will constitute harassment, because doing so could violate the First Amendment.[18]

---

[18] See, for example, *DiTanna v. Edwards*, 323 So. 3d 194, 203 (Fla. Dist. Ct. App. 2021), where the District Court of Appeals for the Fourth District of Florida held that an injunction's terms that "prohibit [appellant's] contact with third parties about appellee," even after appellee was found to have been stalking appellant, constituted a prior restraint of speech in violation of the First Amendment.

Although we recognize that this case does not involve a "prior restraint," which are the "most serious and the least tolerable infringement on First Amendment rights," *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976), there is commonality between *DiTanna* and this appeal in that the prior restraint in *DiTanna* applied to future communications on

29

In conclusion, Schiff's July 17 e-mail to ASA#1 and the July 18 e-mail to ASA#1's colleague ASA#2, were sufficiently without legal purpose to constitute potential harassment under CR § 3-803(a)(3). We do not conclude that the letters Schiff sent to the judges were harassing because they were sufficiently removed from ASA#1 and although inappropriate, touched on legitimate legal issues which could be covered by the First Amendment.

### *Intent to harass, alarm or annoy*

Although this argument was unpreserved, we nonetheless conclude that a rational factfinder could likely have inferred Schiff sent the July 17 and 18 communications to ASA#1 and ASA#2 with the "intent to harass, alarm, or annoy" ASA#1. Schiff asserts that *Galloway* "strongly supports" his position that the evidence is insufficient to show Schiff had the requisite intent. He points out that Galloway's intent to harass the victim there was readily inferred from the volume of communications (130 letters), previous incidents of Galloway stalking and kidnapping the victim, "the implicitly threatening content of the letters," and Galloway's "persistence in sending the letters after repeated requests to stop."

---

the basis of nothing more than that they were "about" the appellee. Having concluded that Schiff's letters to Judges Salant and Bair were not made in ignorance or violation of the reasonable warning Schiff received (i.e., with the intent that the content be passed on to the victim), the only remaining ground on which to find them problematic would be that they make distasteful comments *about* ASA#1. Such a prohibition begins to look less like punishment for speech integral to criminal conduct and more like a content-based restriction that we doubt would survive strict scrutiny. *See People v. Relerford*, 104 N.E.3d 341, 350 (Ill. 2017) (holding a statutory "proscription against 'communicat[ions] to or about' a person that negligently would cause a reasonable person to suffer emotional distress . . . must be considered a content-based restriction because it cannot be justified without reference to the content of the prohibited communications").

30

Schiff contrasts those factors to his case, asserting he did not make any threatening communications, nor did he ignore any request to stop communicating with ASA#1.

For the reasons already explained, we disagree with both contentions. More germane to us in *Galloway* is that the Court of Appeals recognized that

> [a]lthough the threat may not have been explicit, and even considering that some of the letters began with such statements as "[n]othing in this letter is meant to be a threat," a threat reasonably may be inferred considering all of the circumstances presented and the other language in the letters. . . . As the Court of Special Appeals stated, "[a] person of common intelligence would have no trouble understanding that frequent written communication by a convicted felon to the home of a person whom he previously kidnapped and stalked, will seriously annoy or alarm the recipient."

365 Md. at 650–51 (quoting *Galloway v. State*, 130 Md. App. 89, 100 (2000)). Drawing from these principles, we conclude it is of no matter that Schiff asserted in his July 17 e-mail to ASA#1 that each of his communications to her had a legal purpose, and that he had no intent to alarm or annoy her. Nor does it help Schiff in any way that in his letter to ASA#2 he claimed ASA#1's alleged fears of him are "concocted," and that "she could have just told me to stop." Schiff's mere assurances that he was doing nothing wrong are meaningless in light of the fact that he knew, or should have known, that the sum of his communications was causing ASA#1 severe emotional distress.

Also, similar to *Galloway*, a rational factfinder could infer Schiff's intent to alarm or annoy ASA#1 from his decision to continue writing her, and then ASA#2, regarding his 'situation' with ASA#1, even after he received a reasonable warning to stop. At that point, a factfinder could infer that Schiff was aware that his communications about his feelings for ASA#1 were causing her serious distress, and that she was informed when

31

communications about her were received by those with whom she worked closely. Finally, it could be inferred that Schiff should have been aware that given the way he became acquainted with ASA#1—she prosecuted a case against him—such communications to her and about her to close colleagues would be unwanted and unsettling. In sum, the evidence supports rational inferences, such as these, "which could fairly convince a trier of fact" that Schiff acted with the intent to harass, alarm, or annoy ASA#1 even after receiving the Peace Order. *Galloway*, 365 Md. at 649 (2001).

Holding each of Schiff's arguments without merit, we affirm the harassment conviction.

## II. SCHIFF'S CONDUCT WAS NOT PROTECTED BY THE FIRST AMENDMENT.

### A. Parties' Contentions

Schiff asserts that under the First Amendment, "individuals are permitted . . . to express ideas that are offensive, and against mainstream conventions and opinions." It follows, he contends, "that it was within his First Amendment right to express his attraction and desire for [ASA#1]." He adds, once more, that his communications were not threatening. The State counters that the First Amendment permits restrictions on "speech integral to criminal conduct," and that harassment and stalking fall into this category, because "both are forms of criminal conduct that can be accomplished through the use of speech."

## B. Analysis

The First Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment, prohibits laws "abridging the freedom of speech." U.S. CONST. amend. I; *Polk v. State*, 378 Md. 1, 8–9 (2003) (citing *Eanes v. State*, 318 Md. 436, 445 (1990)). Even so, "it is undisputed that 'the First and Fourteenth Amendments have never been thought to give absolute protection to every individual to speak whenever or wherever he [or she] pleases, or to use any form of address in any circumstances that he [or she] chooses.'" *Polk*, 378 Md. at 9 (quoting *Cohen v. California*, 403 U.S. 15, 19 (1971)) (alterations in *Polk*). As the State points out, "speech integral to criminal conduct" is one such area that is not protected. *United States v. Stevens*, 559 U.S. 460, 468 (2010). Indeed, this Court has long recognized the same:

> We think it plain that it is not an abridgment of the constitutional right of free speech to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language. It is the substance rather than the form of communication to which the First Amendment protection attaches, and regulation of the form is constitutional where it arises from a legitimate State interest and not for the sole purpose of censoring the underlying thought or idea.

> The State may, therefore, prevent and punish some classes of speech, among which are 'the lewd and obscene, the profane, the libelous, and the insulting or fighting' words-those which by their very utterance inflict injury or tend to incite an immediate breach of the peace (since) such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.[']

> And as we recognized in *Lynch v. State*, [2 Md. App. 546, 557 (1967]] the resort to epithets or personal abuse is not in any sense communication of information or opinion safeguarded by the Constitution.

*Luthardt v. State*, 6 Md. App. 251, 257–58 (1969) (internal citations omitted) (cleaned up).

33

To the extent we have concluded that there was sufficient evidence before the trial court to find that Schiff's conduct constituted stalking and harassment under CR §§ 3-802 and 3-803 respectively, those communications constitute speech integral to criminal conduct. Because Schiff has raised neither a facial nor an as-applied[19] challenge to the statutes themselves, our analysis on this issue need not go any further.[20] Schiff's challenged communications—perhaps with the exception of his letters to Judges Salant and Bair, which we do not include in our bases for affirming the decisions below—are not protected under the First Amendment.

Accordingly, we do not disturb either of Schiff's convictions and affirm the judgment of the circuit court.

---

[19] Although the State infers Schiff "appears to challenge the laws as applied to him," we believe this gives him too much credit. Schiff does not refer even once to either the stalking or harassment statutes in the section of his brief devoted to his First Amendment argument. His subheading for this section reads: "The evidence was insufficient to sustain the convictions because the correspondence that formed the basis of the stalking and harassment convictions were based on protected speech." We note that were Schiff making an as-applied challenge to either criminal statute, he would not be arguing that the evidence was insufficient to convict him; instead, he would be arguing that in the event the evidence *was* sufficient to render his (protected) conduct criminal under the statutes, those statutes must be unconstitutional.

[20] We observe that Schiff argued in his motion for judgment of acquittal that the stalking statute was "unconstitutionally vague." But that argument is not even remotely raised in this appeal, and we do not address it. *Moosavi v. State*, 355 Md. 651, 660 (1999) ("[I]f a point germane to the appeal is not adequately raised in a party's brief, the [appellate] court may, and ordinarily should, decline to address it."). While we have the discretion to address such an argument, *id.* at 661, we decline to do so, noting that the Court of Appeals rejected a facial challenge on grounds of vagueness and overbreadth to the similarly worded (but substantially indistinct) former harassment statute, Maryland Code, Art. 27, §123. *Galloway*, 365 Md. at 638–39.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. APPELLANT TO PAY THE COSTS.**